PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-1283 & 11-1421
_____

STATE OF DELAWARE DEPARTMENT OF NATURAL
RESOURCES AND ENVIRONMENTAL CONTROL

DELAWARE RIVERKEEPER NETWORK;
THE DELAWARE RIVERKEEPER;
DELAWARE NATURE SOCIETY;
NATIONAL WILDLIFE FEDERATION;
NEW JERSEY ENVIRONMENTAL FEDERATION;
CLEAN WATER ACTION,
Intervenor-Plaintiffs

STATE OF NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL PROTECTION,
Intervenor-Plaintiff

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
HONORABLE JOHN McHUGH,
Secretary of the Army, in his official capacity;
HONORABLE JO-ELLEN DARCY,
Assistant Secretary of the Army for Civil Works,

in her official capacity;
Lt. Gen. ROBERT L. VAN ANTWERP, JR., Commander,
USACOE, in his official capacity;
Lt. Col. THOMAS TICKNER, Commander,
USACOE, North Atlantic Division,
Philadelphia District, in his official capacity

PHILADELPHIA REGIONAL PORT AUTHORITY,

                                    Intervenor-Defendant

Delaware Riverkeeper Network;
The Delaware Riverkeeper;
Delaware Nature Society;
National Wildlife Federation;
New Jersey Environmental Federation;
Clean Water Action,

                              Appellants at No. 11-1283

State of New Jersey Department
of Environmental Protection,

                              Appellant at No. 11-1421
_____

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 09-cv-00821
(Honorable Sue L. Robinson)
_____

2

_____

Nos. 11-1414 & 11-1424
_____

STATE OF NEW JERSEY, DEPARTMENT OF
ENVIRONMENTAL PROTECTION; BOB MARTIN;
DELAWARE RIVERKEEPER NETWORK;
THE DELAWARE RIVERKEEPER;
DELAWARE NATURE SOCIETY;
NATIONAL WILDLIFE FEDERATION;
NEW JERSEY ENVIRONMENTAL FEDERATION;
CLEAN WATER ACTION

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
LIEUTENANT COLONEL THOMAS TICKNER,
as District Commander of the Army Corps
of Engineers Philadelphia District;
JO-ELLEN DARCY, as Assistant Secretary for Civil Works,
United States Army Corps of Engineers;
JOHN McHUGH; LIEUTENANT GENERAL
ROBERT L. VAN ANTWERP, JR.,
Commander (in his official capacity);
COLONEL PETER A. DeLUCA, Commander,
North Atlantic Division in his official capacity

PHILADELPHIA REGIONAL PORT AUTHORITY,
Intervenor-Defendant

State of New Jersey, Department of
Environmental Protection; Bob Martin,
                    Appellants at No. 11-1414

Delaware Riverkeeper Network;
The Delaware Riverkeeper;
Delaware Nature Society;
National Wildlife Federation;
New Jersey Environmental Federation;
Clean Water Action,
                    Appellants at No. 11-1424
                    _____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 09-cv-05591
(Honorable Joel A. Pisano)
                    _____

Argued January 18, 2012

Before:  SCIRICA, FUENTES and
HARDIMAN, *Circuit Judges*.

(Filed: July 3, 2012)

JANE P. DAVENPORT McCLINTOCK, ESQUIRE (ARGUED)
Delaware Riverkeeper Network
300 Pond Street, 2ND Floor
Bristol, Pennsylvania 19007
        Attorney for Delaware Riverkeeper Network;

The Delaware Riverkeeper;
Delaware Nature Society;
National Wildlife Federation;
New Jersey Environmental Federation;
Clean Water Action

KRISTEN D. HEINZERLING, ESQUIRE (ARGUED)
EILEEN P. KELLY, ESQUIRE
JEAN PATRICE REILLY, ESQUIRE
Office of Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625
        Attorneys for State of New Jersey
        Department of Environmental Protection; Bob Martin

MARK R. HAAG, ESQUIRE (ARGUED)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C. 20044
        Attorney for United States Army Corps of Engineers;
        John McHugh; Jo-Ellen Darcy;
        Robert L. Van Antwerp, Jr.; Thomas Tickner;
        Peter A. DeLuca

HARRY WEISS, ESQUIRE (ARGUED)
MICHAEL C. DUFFY, ESQUIRE
MARLENE S. GOMEZ, ESQUIRE
Ballard Spahr

5

1735 Market Street, 51ST Floor
Philadelphia, Pennsylvania 19103

BETH E. MOSKOW-SCHNOLL, ESQUIRE
Ballard Spahr
919 North Market Street, 11TH Floor
Wilmington, Delaware 19801

BARRY A. STEINBERG, ESQUIRE
Kutak Rock
1101 Connecticut Avenue, N.W., Suite 1000
Washington, D.C. 20036

CLAUDIA M. TESORO, ESQUIRE
BARRY N. KRAMER, ESQUIRE
Office of Attorney General of Pennsylvania
21 South 12th Street, 3RD Floor
Philadelphia, Pennsylvania 19107
      Attorneys for Philadelphia Regional Port Authority

_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

At issue is whether the U.S. Army Corps of Engineers can deepen the main channel of the Delaware River by five feet, enabling river ports to be economically competitive and at the same time, comply with statutes that protect the environment. The roots of the project trace back decades. In

6

1992, Congress authorized the project and appropriated $195 million. It continued to support the effort with regular appropriations for the next twenty years.[1] Commencement was delayed for several reasons, but in the fall of 2009, the Corps was ready to proceed. In October 2009, New Jersey and Delaware filed suits in the District Courts of New Jersey and Delaware to enjoin the Corps from dredging the deeper channel. They alleged violations of the National Environmental Policy Act ("NEPA"), the Clean Water Act

---

[1] *See, e.g.*, H.R. Rep. No. 111-278, at 50 (2009) (Conf. Rep.) (appropriating $4.8 million to the deepening project in the Energy and Water Development and Related Agencies Appropriations Act of 2010); H.R. Rep. No. 109-275, at 73 (2005) (Conf. Rep.) (approving $2.25 million to the project in the Energy and Water Development Appropriations Act of 2006). In 1999 and 2000, Congress also supported the project by extending credit to non-federal entities for costs related to design, construction, and disposal. *See* Water Resources Development Act of 2000, Pub. L. No. 106-541, § 306, 114 Stat. 2572 (2000) ("The project for navigation, Delaware River Mainstem and Channel Deepening . . . is further modified to authorize the Secretary to credit toward the non-Federal share of the cost of the project . . . the costs incurred by the non-Federal interests in providing additional capacity at dredged material disposal areas . . ."); Water Resources Development Act of 1999, Pub. L. No. 106-53, § 308, 113 Stat. 269 (1999) (same). Most recently, the U.S. House of Representatives approved $29.45 million for fiscal year 2013. *See* H.R. Rep. No. 112-462, at 29 (2010).

("CWA"), and the Coastal Zone Management Act ("CZMA"). Each District Court granted summary judgment to the Corps, holding no environmental statutes would be breached. We will affirm.

I.

A.

The federal government has maintained navigation in the Delaware River for over one hundred years. The initial project, "Philadelphia to the Sea," was authorized by Congress in 1910 and ensures a navigation channel of 40-foot depth between Allegheny Avenue, Philadelphia, and a deep water point in the Delaware Bay, near Ship John Light. It requires the Corps to dredge 3.45 million cubic yards of material annually and to deposit the sediment at nearby locations, either owned or leased by the federal government. In 2009, the Corps used seven confined sites and one open-water site for disposal.

The deepening project dates to 1954, when the Senate Committee on Public Works, by resolution, requested the Corps to study "the Delaware River between Philadelphia and the sea, for the purpose of identifying the need for any modification to the existing channel dimensions and anchorage areas." In 1970, the House Committee on Public Works also instructed the Corps to analyze commerce along the Delaware River and to identify projects that would promote development of its ports. Pursuant to these directives, the Corps made extensive studies during the 1970s

and 1980s. In 1992, it published a Feasibility Report and Environmental Impact Statement ("EIS"), recommending a deepening of five feet along the "main stem" of the Delaware River, the 102-mile stretch between the mouth of the Delaware Bay and the Philadelphia and Camden harbors.

The Environmental Impact Statement predicted the deepening project would yield substantial economic benefits in the form of reduced costs to shippers. The main stem of the river hosts a concentration of heavy industry, as well as the second largest complex of oil refineries and petrochemical plants in the nation. But, as the EIS observed, "current authorized channel dimensions . . . present a constraint to efficient vessel movement." The report determined that deepening the main navigation channel by five feet would benefit oil tankers, dry bulk shippers, and other large vessels, because it would enable them to service Delaware River ports without needing to "lighter" (transfer a portion of their cargo in the lower Delaware Bay) or "light load" (travel at under-capacity). While the EIS identified potential adverse impacts to water quality, benthic organisms, and fishery resources, it concluded these would be minimal and were outweighed by the project's benefits. Altogether, it forecast that construction and maintenance of a 5-foot deeper channel for five years would require the Corps to dredge 375 million cubic yards of material above the dredging associated with the Philadelphia to the Sea project.

In June 1992, the Corps submitted the Environmental Impact Statement to Congress. That October, Congress passed the Water Resources Development Act, authorizing

the deepening project to go forward. *See* Water Resources Development Act of 1992, Pub. L. No. 102-580, § 101(6), 106 Stat. 4797 ("WRDA"). Congress estimated the project would cost a total of approximately $295 million, with $195 million to be borne by the federal government. *Id.* In December 1992, the Corps issued a Record of Decision stating the deepening project was "economically justified, in accordance with environmental statutes, and in the public interest." Not only would "transportation cost savings . . . outweigh any adverse effects," but the project was preferable to all other alternative plans, including a "no action" alternative.

After issuing the Record of Decision, the Corps initiated the Preconstruction, Engineering and Design ("PED") phase of the project. It consulted federal and state agencies and outside experts, and conducted new environmental analyses. In 1997, the Corps published a Supplemental Environmental Impact Statement ("SEIS"). Its goals were first, to "provide additional information and environmental analysis to address environmental concerns raised during review of the 1992 [EIS]"; and second, to evaluate modifications to the deepening project that had been made since the EIS was published.[2] Like the EIS, the SEIS

---

[2] These modifications were primarily to the project's disposal plan. In the EIS, the Corps assumed it would deposit the dredged sediment from the project at two existing and three new disposal sites. By 1997, the Corps planned to use four, rather than three, new disposal facilities. The Corps also embraced a proposal to store dredged material at four

recommended the project proceed. At the same time, it reduced its estimate of the amount of material to be dredged over 50 years – for initial project construction and future maintenance – from 375 to 321 million cubic yards. Like the EIS, the SEIS concluded the project would yield considerable economic benefits at a minimal environmental cost. On December 18, 1998, the Corps issued a second Record of Decision stating it had "reviewed and evaluated documents concerning the proposed action, including additional PED phase studies," and it concluded "[t]he public interest will best be served by implementing the improvements identified and described in the Feasibility Report and the Supplemental Environmental Impact Statement." The Record of Decision reiterated that "[a]ll practical means to avoid or minimize adverse environmental effects have been incorporated into the recommended plan."

For the next eleven years, progress on the deepening project stalled. One reason for the delay was that in the mid-2000s, the Delaware River Port Authority ("DRPA") withdrew the support it had tendered in 1999, leaving the Corps without a local partner.[3] In June 2008, the Philadelphia

---

"beneficial use" sites in Delaware and New Jersey – at Kelly Island, DE, for wetlands restoration; at Egg Point Island, NJ, also for wetlands restoration; and at Broadkill and Slaughter Beaches, DE, for beach nourishment. The sand for Broadkill Beach would first be stockpiled elsewhere.

[3] The bi-state board of the DRPA came to stalemate at its meeting in December 2005, when the New Jersey commissioners on the board refused to endorse the deepening

River Port Authority ("PRPA") came forward and signed a partnership agreement with the Corps. The agencies agreed to share costs: 75% for the Corps, 25% for PRPA.

By late 2008, the Corps was ready to commence dredging the deeper channel. But over a decade had passed since the SEIS was published, and there were new developments. First, improved survey technology meant the deepening could be deployed more efficiently, reducing the amount of sediment. The total estimated dredging for the project over a 50-year period was reduced again, from 321 to 232 million cubic yards. Accordingly, the updated disposal plan called for using only existing, federally-owned sites – the four new disposal sites included in the SEIS were no longer necessary. Second, the construction plan now called for dredged sand from the Delaware Bay to be deposited

project and Pennsylvania Governor Ed Rendell, Chairman of the DRPA, refused to adopt the agency's budget until the project was approved. *See* Geoff Mulvihill, *Dredging Spat Deepens Between Two Neighbors*, Associated Press, Dec. 31, 2005. For the next 18 months, the meetings of the DRPA were suspended. In May 2007, the two states finally reached a deal: DRPA would return the $38.5 million set aside for the project to Pennsylvania and New Jersey, half-and-half; DRPA would hand jurisdiction over the project to the Philadelphia River Port Authority ("PRPA"); Pennsylvania would proceed in collaboration with PRPA; and New Jersey would use its share of the returned money for local improvement projects. *See* Deborah Yao, *Pa., N.J. Finally Agree on Delaware River Dredging Project*, Associated Press, May 18, 2007.

directly onto Broadkill Beach, DE, rather than temporarily stockpiled offshore. Third, the reduction in the amount of predicted dredged material meant a wetlands restoration project at Egg Point Island, NJ, would be deferred. Finally, there were two environmental changes since 1997. An oil spill from the T/S Athos I in November 2004 had released 265,000 gallons of oil into the Delaware River, temporarily increasing the toxicity of the river's sediments. Also, recent surveys predicted an expansion in the number and distribution of shortnose sturgeon in the Delaware River, potentially increasing the risk that rock blasting in the Marcus Hook region could cause the species.

The Corps released a public notice on December 17, 2008, announcing it was undertaking a new "environmental review." The notice stated:

> Notice is hereby given that the Philadelphia District, U.S. Army Corps of Engineers, is conducting an environmental review of all applicable, existing and new information generated subsequent to the Supplemental Environmental Impact Statement (SEIS) of 1997 prepared for the Delaware River Main Stem and Channel Project . . . . At present, the Philadelphia District has found no factors precluding the Project from moving forward based on previous studies. A summary of project changes and environmental changes known to date is attached. The public and all agencies are invited to comment on the attached

13

changes, and to identify any applicable existing and new information generated subsequent to the 1997 SEIS by responding to this Public Notice. A copy of the SEIS of 1997 and other environmental studies performed since the completion of the SEIS, are among the information available on the District's website. The environmental review referenced above will be used to update the environmental record, and to determine whether further environmental work and analyses are needed.[4]

On April 3, 2009, the Corps published an Environmental Assessment ("EA"). The report's central conclusion was that no additional environmental impact statement was necessary. None of the developments since 1997 – the elimination of the four new disposal sites, the plan for direct stockpiling at Broadkill Beach, the deferment of wetlands restoration at Egg Point Island, and the possible changes to the natural environment – had materially altered the project's environmental risk profile. Thus, the EA closed with a signed declaration by the Commander of the Corps' Philadelphia District, stating:

Based on the information contained in this EA . . . 1) none of the changes to the proposed project are "substantial"; and 2) there are no

---

[4] The Corps provided the public four weeks for comments (initially, two weeks were provided but the Corps lengthened this in response to requests for more time).

14

new circumstances that can be considered "significant." Therefore, I have determined that the threshold for preparation of a Supplemental Environmental Impact Statement (SEIS) . . . has not been met and that changes to the project or project conditions since the 1997 SEIS will not have a significant adverse effect on the human environment.

Like the Environmental Impact Statement and Supplemental Environmental Impact Statement, the Environmental Assessment recommended the project proceed because its substantial economic benefits outweighed any possible adverse environmental effects.[5] On April 8, 2009, the Corps

[5] The 2009 EA described the economic benefits of the deepening project as follows:

The NED [National Economic Development] benefits quantified include the reduced costs of transportation realized through operational efficiencies (reduced lightering and lightloading), and the use of larger more efficient vessels, both resulting from navigation improvements at the harbor. Reduced transportation costs result in reduced production and distribution costs and thereby increase the net value of the national output of goods and services.

Benefits will result from the decrease in the cost per ton for shipping commodities into or out of the Delaware River Port System. The

transmitted the 1997 Supplemental Environmental Impact Statement and 2009 Environmental Assessment to the chairs of the Senate and House Subcommittees on Energy and Water Development in the Committees on Appropriations.

When Congress first authorized the deepening project in 1992, the Corps initiated a comprehensive process of discussion, coordination, and collaboration with New Jersey and Delaware to obtain the state authorizations mandated by various environmental statutes. Two statutes are relevant to this appeal. First, the Coastal Zone Management Act

> 45 foot channel depth will improve the economic efficiency of ships moving through the Delaware River ports. No induced tonnage (i.e., commodity shifts from other ports) will take place with the proposed project deepening. The largest vessels in the port fleet, crude oil tankers, currently lighter at Big Stone Anchorage in the naturally deep water of the lower Delaware Bay. These vessels will continue to carry the same tonnage from foreign origin ports but will be able to operate more efficiently in the Delaware River with a deepened channel from reduced lightering. This will also result in a reduction in barge traffic needed to move the lightered crude oil upriver to the refineries. Also, a deeper channel depth will allow current dry  bulk and container vessels to carry more cargo as well as allow a fleet shift in the charter dry bulk market.

obligates the Corps to submit a "consistency determination" to any state whose "coastal zone" will be affected by one of its activities. 16 U.S.C. § 1456(c)(1)(A), (C). The consistency determination describes how the Corps will deploy the project "in a manner which is consistent to the maximum extent practicable" with the state's program for managing coastal areas. *Id.* If the Corps receives a "concurrence," it may proceed; if it does not, it can proceed over the state's objection in limited circumstances. 15 C.F.R. §§ 930.41(a)-(d), 930.43(d). Second, the Clean Water Act requires the Corps to comply with all state laws "respecting the control and abatement of water pollution." 33 U.S.C. § 1323(a). The Corps must obtain a state "water certification" when, on the basis of a federally-issued permit, it plans to discharge pollutants into a state's navigable waters. 33 U.S.C. § 1341(a).

To comply with the CZMA, the Corps submitted "consistency determinations" to the Delaware Department of Natural Resources and Environmental Control ("DNREC") and the New Jersey Department of Environmental Protection ("NJDEP") in 1996. Delaware identified several concerns, but provided a concurrence on May 1, 1997. New Jersey signed a Memorandum of Understanding with the Corps on August 29, 1997, and on the same day, provided a concurrence. Accordingly, both CZMA clearances were in place in 1997. But each state retreated. New Jersey attempted to "revoke" its CZMA concurrence in September 2002, and requested supplemental filings from the Corps in 2008 and again in 2009. Delaware issued an order requiring the Corps to submit a new consistency determination in 2009, contending

17

"substantial project modifications" had rendered its 1997 concurrence outdated.

The Corps did not provide supplemental consistency determinations to New Jersey or Delaware. Rather, on November 9, 2009, it issued a Memorandum of Record concluding that no additional coordination was necessary for the Corps to comply with the CZMA. The Corps referred to the April 2009 EA, which had found that no substantial changes to the project had been made and no significant new information about the project's consequences had surfaced since the 1997 SEIS. Because concurrences from each state had been in place at that point in time, and because the project's risk profile had not changed, it was not necessary to provide supplemental consistency determinations.

On January 19, 2001, the Corps initiated coordination with Delaware to comply with the Clean Water Act; that is, it applied to the Delaware Department of Natural Resources and Environmental Control for a water quality "certification" as well as for Subaqueous Lands and Wetlands permits. *See* 7 Del. Code chs. 60, 66 & 72. These efforts were unsuccessful. Significantly, Delaware took no action on the Corps' application for the next eight years.[6] On December 30, 2008,

---

[6] DNREC did hold hearings on the Corps' application in December 2001, soliciting public comments and hiring an independent consultant to serve as a Hearing Officer. In 2003, the Hearing Officer published a report recommending that Delaware deny the application. But DNREC did not act on the recommendation for the next five years.

18

it filed a comment in response to the public notice issued by the Corps on December 17, stating it would review any new information on the project "in the context of a new Delaware subaqueous lands and wetlands permit application." The implication was that Delaware had denied, by inaction, the prior requests for Subaqueous Lands and Wetlands permits and was now requesting a new application.[7] On July 23, 2009, eight and a half years after the Corps filed its application, Delaware made its denial of the 2001 application official by order of the Secretary of DNREC.

The record does not indicate whether the Corps applied for a water quality certification from New Jersey to comply with the Clean Water Act. But neither party disputes that to date, the Corps has not obtained such a certification from New Jersey.

Despite these roadblocks, the Corps issued a Memorandum of Record on April 30, 2009, invoking its authority to "maintain navigation" under Section 404(t) of the Clean Water Act. *See* 33 U.S.C. § 1344(t). This authority, the Corps contends, relieved it of any further obligation to obtain Subaqueous Lands and Wetlands permits from Delaware. The Corps drew additional authority from Section 404(r) of the CWA, which provides a special waiver for projects that are congressionally authorized. *Id.* § 1344(r). It contends Section 404(r) obviated the need to obtain water quality certifications from Delaware or New Jersey.

---

[7] Delaware's letter did not directly mention the issue of the water quality certification.

By late 2009, the Corps believed it had complied with all statutory mandates and could begin dredging the deeper channel. Under NEPA, it had published an Environmental Assessment in April 2009, concluding the project was in the public interest and that no additional environmental impact statements were necessary. Under the CZMA, it had submitted consistency determinations to New Jersey and Delaware in 1996, obtained concurrences within a year, and issued a Memorandum of Record announcing no additional CZMA coordination was necessary. Under the Clean Water Act, it had issued a separate Memorandum of Record in April 2009, invoking Section 404(t) of the Act to overcome the need for the special Delaware permits, and believed it could otherwise rely on the Section 404(r) exemption to circumvent the water quality certifications. In October 2009, the Corps entered into a contract with PRPA which authorized it to initiate the project at "Reach C," a 12-mile stretch spanning from the Delaware Memorial Bridge to the C&D Canal. The contract did not authorize the Corps to deepen any other portion of the river until December 2010.

B.

On October 30, 2009 and November 2, 2009, the Delaware Department of Natural Resources and Environmental Control and the New Jersey Department of Environmental Protection initiated actions in the District Courts of Delaware and New Jersey to prevent the Corps from commencing dredging of the deeper channel. In the Delaware action, DNREC sued under the Clean Water Act, Clean Air Act, Coastal Zone Management Act, and the

20

Delaware Code, requesting the court enjoin the Corps until it obtained the authorizations and concurrences from Delaware specified by those statutes. Delaware Riverkeeper Network ("Riverkeeper") intervened as a plaintiff, and PRPA as a defendant. On January 29, 2010, the District Court granted in part and denied in part Delaware's request. It preliminarily enjoined the project at Reaches A, B, D, and E, but allowed the Corps to commence at Reach C.[8] The parties filed and cross-filed motions for summary judgment, and on December 7, 2010, the District Court dissolved its partial injunction and granted summary judgment to the Corps and PRPA. It held the Corps had properly invoked its authority to "maintain

---

[8] The reasoning for the District Court's ruling was as follows. At a hearing in December 2009, the Corps claimed construction at Reach C was slated to begin imminently, but subsequent phases would not commence until December 2010. Meanwhile, despite its delay, DNREC had represented that it was prepared to complete its administrative review of the Corps' application for the various state authorizations within a year. The District Court reasoned that while the Corps was likely to prevail on its claim that all federal statutes had been complied with, and so construction at Reach C should commence, there was no harm in enjoining the remainder of the project to enable DNREC to provide its decisions on the Corps' application. Given that future phases of the project were not slated to begin for a year anyway, and that DNREC claimed it would complete its review within that time, the partial injunction would facilitate federal-state coordination while not compromising the Corps' interests.

navigation" under Section 404(t) of the CWA, and this made all the difference. It held: "Having determined that the navigation exception . . . is applicable here . . . the Corps is exempt from compliance with the CWA, CZMA, and CAA, and judgment must be entered in its favor."

In the New Jersey action, NJDEP sought relief under NEPA, the CWA, the CZMA, the Clean Air Act, the Fish & Wildlife Coordination Act, the Water Resources Development Act, and the Magnuson-Stevens Fishery Conservation and Management Act. NJDEP asked the court to enjoin the Corps until it had "comprehensively sample[d] and analyze[d] the sediment within the areas to be dredged," issued a new SEIS, obtained a water quality certificate from New Jersey, and completed its supplemental coordination under the CZMA. Riverkeeper again intervened as a plaintiff, and PRPA again intervened as a defendant. The parties filed and cross-filed motions for summary judgment and on January 13, 2011, the court granted summary judgment in favor of the Corps and PRPA. The court held the Corps had complied with NEPA when it issued the 2009 EA, complied with the CZMA when it declined to provide a supplemental consistency determination, and was relieved of its obligations under the CWA because Congress authorized the project in 1992. Riverkeeper and New Jersey appealed both judgments under NEPA, the CZMA, and the CWA, and we consolidated their cases for review. Delaware did not file an appeal.

As this litigation unfolded, the Corps made headway on the project. After receiving court approval in January 2010, it commenced dredging at "Reach C" and completed

22

that segment in September 2010. In November 2011, the Corps began deepening the 4-mile stretch known as "Lower Reach B," which extends from Oldsman Creek to the Delaware Memorial Bridge. That segment is now also complete. *See Delaware River Main Channel Deepening Project: Construction Status*, U.S. Army Corps of Engineers Philadelphia District, http://www.nap.usace.army.mil/cenap-pl/drmcdp/drcs.htm (last updated Jan. 20, 2012); Jon Hurdle, *New Federal Funding May Move Delaware River Channel-Deepening Project Forward*, DFMNews (Feb. 20, 2012), http://www.delawarefirst.org/23188-delaware-river-channel-deepening.

## II.[9]

We review grants of summary judgment de novo. *Startzell v. City of Phila.*, 533 F.3d 183, 192 (3d Cir. 2008). Summary judgment is proper when the pleadings, the discovery, the disclosure materials on file, and any affidavits show that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because appellants challenge the actions of a federal agency (the Corps) in its application of federal law (NEPA, the CWA, the CZMA, and corresponding regulations), our standard of review is informed by administrative law doctrines prescribing the degree of

---

[9] Appellants' causes of action arise under federal law. Accordingly, the Delaware and New Jersey District Courts had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291.

deference a reviewing court should apply to agency conduct. We elaborate further on the amount of deference due for each of the statutory challenges.

## III.

New Jersey and Riverkeeper contend the Corps' decision to proceed with the project in 2009 ran afoul of NEPA procedurally and substantively. As for procedures, appellants contend the publication of the EA was arbitrary and capricious because the Corps failed to comply with the regulations governing the preparation of NEPA studies. As for substance, appellants contend the EA fell short of the "hard look" demanded by NEPA on whether an SEIS was necessary. As explained below, we find all NEPA claims unavailing.

## A.

Congress enacted the National Environmental Policy Act of 1969, Pub. L. No. 91-190, 83 Stat. 852 (codified at 42 U.S.C. § 4321 *et seq.*), to further two goals: ensure federal agencies consider the environmental consequences of projects before committing resources; and facilitate agencies' communication with the public about their environmental analyses. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-52 (1989). NEPA is a procedural statute. Its goal is to "prohibi[t] uninformed – rather than unwise – agency action." *N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 134 (3d Cir. 2009) (internal quotation marks and citation omitted). NEPA also

created the Council of Environmental Quality ("CEQ") within the Executive Office of the President, granting it authority to issue regulations effectuating NEPA. CEQ regulations are "mandatory" for all federal agencies, carry the force of law, and are entitled to "substantial deference." *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 372 (1989); *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979). In addition to CEQ regulations, agencies are bound by whatever regulations they promulgate under NEPA. *E.g.*, 33 C.F.R. § 230 *et seq.* (U.S. Army Corps of Engineers' regulations).

NEPA requires federal agencies to prepare environmental impact statements before undertaking "major [f]ederal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).[10] To comply, an

---

[10] In full, NEPA provides:

> [A]ll agencies of the Federal Government shall . . . include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on – (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and

agency must first decide whether a contemplated project qualifies as a "major federal action significantly affecting the quality of the human environment." CEQ regulations instruct the agency to consider both the "context" and "intensity" of the action to determine if its environmental effects will be "significant." 40 C.F.R. § 1508.27(a)-(b). If the project qualifies, the agency should assess whether it is of a type that "[n]ormally requires an environmental impact assessment" or "[n]ormally does not require either an environmental impact statement or environmental assessment (categorical exclusion)." *Id.* § 1501.4(a)(1)-(2). If the action normally requires an impact statement, the agency should prepare one. If it normally requires neither an impact statement nor an assessment, the agency can proceed with the project. In all remaining situations, the agency should "prepare an environmental assessment" for the action. *Id.* § 1501.4(b). An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Id.* § 1508.9(a). If the agency concludes on the basis of the EA that no environmental impact statement is needed, it must issue a Finding of No Significant Impact ("FONSI"). *Id.* § 1501.4(e).

Agencies must update – or "supplement" – their environmental impact statements over time to ensure they are

> irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

26

current. *Marsh*, 490 U.S. at 370-74. CEQ regulations instruct agencies to "prepare supplements to either draft or final environmental impact statements" in two situations: (1) if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or (2) if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see also* 33 C.F.R. § 230.13(b) (requiring the Corps to supplement an EIS "whenever required as discussed in 40 CFR 1502.09(c)"). The Supreme Court has elaborated that an agency must take a "hard look" in assessing whether either of the Section 1502.9(c) scenarios is present. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72-73 (2004). Understandably, neither NEPA nor CEQ regulations prescribes particular proceedings agencies should use in carrying out this "hard look." *In re Operation of Mo. River Sys. Litig.*, 516 F.3d 688, 695 (8th Cir. 2008).[11]

---

[11] For instance, there is no requirement that the agency use an EA to determine if a supplemental EIS is needed. In *Marsh*, the Supreme Court upheld a decision by the Corps not to issue a supplemental EIS when the agency had used a Supplemental Information Report ("SIR") rather than an EA to assess new information. *Marsh*, 490 U.S. at 385 (holding "the Corps acted within the dictates of NEPA in concluding that supplementation was unnecessary" when its SIR found "the new information was of exaggerated importance").

B.

Judicial review of agency conduct under NEPA is deferential. The sole question on review is whether the agency's actions were arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A). When an agency publishes an EA and concludes an EIS is not needed, courts set those determinations aside only if there is evidence they were arbitrary or capricious. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) ("An agency's decision not to prepare an EIS can be set aside only upon a showing that it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing 5 U.S.C. § 706(2)(A)); *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3d Cir. 2000). Similarly, arbitrary and capricious review attaches to an agency decision not to supplement an EIS. *Marsh*, 490 U.S. at 375-76 ("We conclude that review of the narrow question . . . whether the Corps' determination that the FEISS need not be supplemented should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A).").

If some years pass between an agency's completion of an EIS and its commencement of a project, a supplemental EIS may be indicated.  But in *Marsh*, the Court made clear that judicial review of agency conduct in such situations is "narrow," as is generally the case with arbitrary and capricious review. *Marsh*, 490 U.S. at 378. An agency's decision not to supplement an EIS "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Id.* at 376. Thus, the standard is still whether the action evidences arbitrary or capricious decision-

28

making. *See Town of Winthrop v. Fed. Aviation Admin.*, 535 F.3d 1, 3 (1st Cir. 2008) (upholding the FAA's decision in 2007 not to supplement an EIS from 2002); *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1103-04 (8th Cir. 2005) (upholding the Corps' decision in 2004, after conducting an EA, not to supplement an EIS from 1999); *Price Road Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505 (9th Cir. 1997) (upholding the Federal Highway Administration's determination that a project change did not require a new EA).[12]

---

[12] In *South Trenton Residents Against 29 v. Federal Highway Administration*, 176 F.3d 658, 663 (3d Cir. 1999), we "assume[d] . . . an agency's determination not to revise an Environmental Impact Statement must be 'reasonable under the circumstances.'" (internal citations and quotation marks omitted; alteration in original). But *Marsh* unquestionably held that review in such contexts is for arbitrary or capricious action. *Marsh*, 490 U.S. at 375-76 ("The parties disagree . . . on the standard that should be applied by a court that is asked to review the agency's decision. Petitioners argue that the reviewing court need only decide whether the agency decision was 'arbitrary and capricious,' whereas respondents argue that the reviewing court must make its own determination of reasonableness to ascertain whether the agency action complied with the law. In determining the proper standard of review, we look to § 10(e) of the Administrative Procedure Act (APA), 5 U.S.C. § 706 . . . . We conclude that review of the narrow question before us whether the Corps' determination that the FEISS need not be

C.

In our review of the Corps' conduct, we conclude that its publication of the 2009 EA was neither arbitrary nor capricious.

1.

The Corps complied with the procedural requirements prescribed by NEPA and its corresponding regulations because it engaged in a transparent and inclusive process, soliciting the views of federal and state agencies as well as of members of the public, and published an exhaustive, 179-page Environmental Assessment that reviewed the project's risks, responded to concerns raised, and came to the reasonable conclusion the project should proceed.

Neither CEQ nor Corps regulations detail the process an agency should follow when publishing an environmental assessment. *See generally* 40 C.F.R. § 1508.9 (CEQ regulations defining EAs); 33 C.F.R. § 230.10 (Corps regulations defining EAs). There are no notice requirements, pre-circulation requirements, or instructions about the public comments process. CEQ regulations only provide that agencies "shall involve . . . the public, to the extent practicable, in preparing [environmental] assessments[.]" 40 C.F.R. § 1501.4(b). This is different in the case of environmental impact statements, for which CEQ and Corps

supplemented should be set aside is controlled by the 'arbitrary and capricious' standard of § 706(2)(A).").

regulations are detailed.[13] *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004) ("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS.").

The Corps' procedures in preparing and publishing the 2009 EA satisfied Section 1501.4(b)'s directive to "involve . . . the public to the extent practicable." On December 17, 2008, the agency published a notice stating it was undertaking an "environmental review" in order "to update the environmental record, and to determine whether further environmental work and analyses are needed." The Corps provided a summary of changes to the project that had been made since 1997 and links to the SEIS, EIS, and reports by other federal agencies. Collectively, the notice and appended materials communicated to the public that the Corps was undertaking a new environmental study of the deepening project and that its goal was to determine whether "further environmental work,"

---

[13] CEQ regulations mandate that agencies "publish a notice of intent in the Federal Register" at the earliest "practicable" moment regarding the preparation of an environmental impact statement, 40 C.F.R. § 1501.7; disseminate a copy of the draft or final EIS for public review before taking further action, *id.* § 1506.10(b)(1), (2); "[r]equest comments [on the EIS] from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected," *id.* § 1503.1(a)(4); and "respond by one or more of the means listed below" to the comments received, *id.* § 1503.4(a). *See also* 33 C.F.R. §§ 230.19, App. C ¶¶ 1-2 (regulations governing draft and final EIS reports).

such as a new SEIS, was needed. It directly provided the public with access to the information it would rely upon and solicited comments. The 30-day comment period was equal to the length of time mandated by CEQ regulations for comment periods for final EIS studies. 40 C.F.R. § 1506.10(b)(2). The Corps was transparent, clear, and inclusive.

After soliciting and reviewing the public comments, the Corps published a thorough, 179-page Environmental Assessment on April 3, 2009. The report addressed the substance of the most important issues raised in the comments – questions about sediment quality, water quality, air quality, biological resources, and the impacts of the Athos oil spill. Each environmental risk, the report concluded, was minimal and could be mitigated through appropriate implementation measures. The Corps also responded in great detail to a comment filed by the New Jersey Department of Environmental Protection on January 14, 2009, sending the agency a letter on April 24, 2009 that reiterated the findings of the EA and expounded on its conclusions.

Despite the Corps' comprehensive public engagement, appellants contend it acted arbitrarily and capriciously under NEPA. They argue the Corps provided inadequate public notice; erred in declining to publish a FONSI alongside the EA; erred in not circulating a draft of the EA for public review before publication; and did not meaningfully review the comments submitted. None of these claims has merit.

Regarding public notice, appellants contend the Corps did not specify the form of its forthcoming "review," i.e., that it would be an Environmental Assessment, and that the comment period fell during a time of year when many people are on vacation. But as explained, neither NEPA nor its corresponding regulations impose a public notice requirement for EAs. *See generally* 40 C.F.R. § 1508.9; 33 C.F.R. § 230.10. The CEQ regulations only direct that agencies "involve . . . the public, to the extent practicable." 40 C.F.R. § 1501.4(b). The December 17, 2008 notice satisfied this mandate by describing a forthcoming "environmental review" that would be "used to update the environmental record, and to determine whether further environmental work and analyses are needed." Furthermore, the Corps appended a wealth of materials to its notice to make evident the information it would rely upon and to solicit feedback on that information. Courts have upheld EAs preceded by public notices with the same or with considerably less detail than that here. *E.g.*, *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 519 (D.C. Cir. 2010) (involving a public notice that did not "suppl[y] any specific environmental information"); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 952-53 (9th Cir. 2008) (involving a notice that did not specify an EA was being prepared); *Alliance To Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 108, 115 (1st Cir. 2005) (involving a notice that did not mention a forthcoming EA).

Second, appellants fault the Corps for publishing the EA without issuing a Finding of No Significant Impact. But

neither CEQ nor Corps regulations impose a FONSI requirement in this context – an agency deciding, on the basis of an EA, whether to issue a supplemental EIS. The regulations require FONSIs only when the agency employs an EA to decide whether to issue an initial EIS. *See* 40 C.F.R. § 1501.4(e) (instructing agencies to prepare "a finding of no significant impact (§ 1508.13) if the agency determines on the basis of an environmental assessment not to prepare a[n environmental impact] statement"); 33 C.F.R. § 230.11 ("A FONSI shall be prepared for a proposed action, not categorically excluded, for which an EIS will not be prepared."). Given that CEQ and Corps regulations authorize the use of EAs for a wide array of purposes, *see* 40 C.F.R. § 1501.3(b) ("Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking."); 33 C.F.R. § 230.10(c), their silence on FONSIs for all but the initial EIS-determination is instructive. The Corps was not required to issue a FONSI, and its decision to refrain from doing so was not arbitrary or capricious. *See In re Operation of Mo. River Sys. Litig.*, 516 F.3d at 695 ("[T]he Corps prepared an EA, not to help it decide whether to prepare an EIS, but rather to determine whether the change in agency action required an SEIS. As this case illustrates, it is reasonable to expect that the Corps will sometimes determine that a FONSI is not appropriate because the action being taken has a significant impact on the environment, but an SEIS is not required because the impact was sufficiently analyzed in an earlier FEIS [Final

Environmental Impact Statement]. This approach is neither a misuse of the EA procedure nor a violation of NEPA.").[14]

<hr />

[14] We recognize that the Corps' General Counsel, Earl Stockdale, came to a different conclusion on the necessity of a FONSI. In an internal memorandum prepared for the agency, he reasoned that "all EAs must result in either a FONSI or an EIS with no exception" and so "without preparing of a FONSI, the Corps will simply not have completed its required NEPA process." This conclusion was incorrect. The sole regulatory provisions cited by Stockdale to support his analysis were 40 C.F.R. § 1501.4(e) and 33 C.F.R. § 230.11. These provisions do require FONSIs, but only for the initial EIS determination. *See supra*.

Nonetheless, even if the FONSI requirement under Section 1501.4(e) attached, the Corps complied with it. The last page of the EA contained a signed declaration by Lieutenant Colonel Thomas Ticker, stating: "Based on the information contained in this EA and the referenced studies, I have concluded that . . . . the threshold for preparation of a Supplemental Environmental Impact Statement (SEIS) set forth at 40 CFR 1502.9(c) has not been met and that changes to the project or project conditions since the 1997 SEIS will not have a significant adverse effect on the human environment." It was neither arbitrary nor capricious for the Corps to assume this signed declaration operated as a FONSI. The CEQ regulations define a FONSI as "a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment

Third, appellants contend the Corps' failure to circulate a draft of the EA before final publication was procedurally invalid. But neither CEQ nor Corps regulations impose a universal requirement to circulate draft EAs before publication. The CEQ regulations instruct that a document be disseminated for public review only when it is a draft or final EIS, 40 C.F.R. § 1506.10(b), or involves a "proposed action" that (i) would normally require an EIS which the agency has decided to forgo, or (ii) is "without precedent," *id.* § 1501.4(e)(2)(i), (ii). The Corps' regulations require that EAs be circulated before publication only when they concern "feasibility, continuing authority, or special planning reports and certain planning/engineering reports." 33 C.F.R. § 230.11. The EA for the deepening project did not fall into any of these categories.[15] *See Bering Strait Citizens*, 524 F.3d at

---

and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13.

[15] The EA by definition was not a draft or final EIS, so was not covered by 40 C.F.R. § 1506.10(b). It also did not fall under either prong of 40 C.F.R. § 1501.4(e)(2) – it is not an action "which normally requires the preparation of an environmental impact statement" under § 1501.4(e)(2)(i), because Corps regulations provide an exclusive list of such actions at 33 C.F.R. § 230.6 and the project does not qualify; and it is not an action "without precedent" under § 1501.4(e)(2)(ii), because the Corps has maintained dredging operations in the Delaware River since 1910. Finally, the EA did not fall under 33 C.F.R. § 230.11. That section refers to reports produced by the Corps pursuant to specific regulatory

952 ("We hold today that the circulation of a draft EA is not required in every case. . . . Our conclusion is consistent with the views of other circuits, which uniformly have not insisted on the circulation of a draft EA."); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 549 (11th Cir. 1996) (holding there was "no legal requirement that an Environmental Assessment be circulated publicly and, in fact, they rarely are" (emphasis omitted)). Meanwhile, although some evidence in the record suggests the Corps often released EAs for public review before publication, this was a nonbinding internal practice from which the Corps had discretion to deviate. *United States v. Caceres*, 440 U.S. 741, 754 n.18 (1979) ("[A]gencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal.'"). It exercised that discretion reasonably, given the long history of public involvement in reviewing and commenting on the deepening project, including the recent four-week comment period, and given the EA's central conclusion that no factor or development altered the findings

---

programs, none of which apply here. *See* 33 C.F.R. §§ 263.10, 263.15, 263.19 ("Continuing Authorities Program"); *id.* § 230 App. A ("feasibility studies"); *see also* Procedures for Implementing the National Environmental Policy Act (NEPA), 53 Fed. Reg. 3120, 3124 (Feb. 3. 1988) (explaining that 33 C.F.R. § 230.11 requires a "30 day review of the EA" for the "types of actions" specified in the rule, none of which include dredging activities). Appellants appear to concede that none of the provisions mandating EA pre-circulation apply here. N.J. Br. at 44-46; Riverkeeper Br. at 79-81.

of the earlier reports. *E.g.*, *Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1240 (2d Cir. 2002) (refusing to grant a preliminary injunction based on the Corps' decision not to circulate a draft EA because the action was not one which "normally requires" an EIS nor "without precedent" under 40 C.F.R. § 1501.4(e)(2), and so did not have a pre-circulation requirement).

Finally, appellants contend the Corps failed to meaningfully consider the public comments it received on its December 17, 2008 notice. But the 179-page Environmental Assessment comprehensively addressed the key issues raised in the comments. *See supra.* Furthermore, the record demonstrates over twenty years of engagement by the Corps with the public, state governments, and other federal agencies. The Corps' activity in the 2008-2009 period was the final chapter of this engagement. On May 4, 1989, the Corps issued a notice of intent to file a Draft Environmental Impact Statement on the deepening project. It circulated a copy of that report for public comment on July 13, 1990, and released a final EIS in February 1992, incorporating the comments received. The Corps repeated this public engagement process for the SEIS in 1997. Between 1992 and 2008, it had a steady stream of communications with the EPA, New Jersey, and Delaware about the project's compliance with the Clean Water Act and the Coastal Zone Management Act. It also engaged in rigorous coordination with the National Marine Fisheries Service ("NMFS"), conducting an Endangered Species Act consultation in 1996 and preparing a Biological Assessment for the agency in 2009. Given this twenty-plus year period of public, inter-state, and inter-agency

involvement, the assertion that the Corps failed to engage the public or respond to its views lacks merit.[16]

## 2.

NEPA not only requires that agencies follow certain

---

[16] The record does not show the Corps' decision to proceed with the project was "predetermined," making the EA a sham review. *See* Riverkeeper Reply Br. at 22; NJ Reply Br. at 15. NEPA reviews "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). We will invalidate projects where the "agency has impermissibly committed itself to a course of action before embarking upon a NEPA analysis." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 716 (10th Cir. 2010). But there is no indication that the Corps "impermissibly committed itself" to the deepening project before completing the EA. It did not begin dredging or make an "irretrievable commitment of resources" while the environmental review was pending. *Metcalf*, 214 F.3d at 1143. The one contract it entered into before the EA was finalized – the Project Partnership Agreement, which was signed with the Philadelphia Regional Port Authority on June 23, 2008 – expressly acknowledged that the Corps would "expeditiously construct the general navigation features . . . applying those procedures usually applied to Federal projects, pursuant to Federal laws, regulations, and policies." In other words, construction was made contingent on a successful NEPA review.

procedures when assembling environmental reports, but also that they take a "hard look" at the environmental costs of the proposed action as compared to the contemplated benefits. *See Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 98 (1983) ("Congress, in enacting NEPA . . . . required [] that the agency take a 'hard look' at the environmental consequences before taking a major action."); *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). The Corps provided the necessary "hard look" at the project's costs and benefits, and at whether an additional SEIS was needed for the project, in the 2009 EA. Riverkeeper and New Jersey advance three reasons for why the agency's review was not sufficient, none of which is convincing.

First, Riverkeeper argues the EA failed to adequately address the adverse impacts the project could cause on the shortnose sturgeon. The shortnose sturgeon was included in the federal Endangered Species list at least as far back as 1996, meaning it bore that classification at the time the SEIS and EA were published. Some agencies and organizations had expressed concern during the comments period that the analysis of the shortnose sturgeon in the 1997 SEIS was no longer sufficient. New information about the species and its use of the Delaware River had become available, such that "the proposed deepening may affect shortnose sturgeon in a manner or to an extent not considered" previously.

The EA contained no fewer than four separate sections on the shortnose sturgeon, including a comprehensive assessment of the species in an appended Essential Fish

Habitat Evaluation. The report acknowledged that recent surveys showed "a significant expansion in the number and distribution of shortnose sturgeon in the Delaware River appears likely," but it also cited a 2005 study which found that "large aggregations of sturgeon do not exist in the blasting area." Furthermore, it explained how blasting techniques could be honed to minimize harm to the species. The Corps drew on these analyses – as well as its findings in a Biological Assessment published for NMFS earlier that year – to conclude that adverse impacts to the shortnose sturgeon would be minimal.[17] The Corps' conclusion was neither arbitrary nor capricious.

Riverkeeper also contends the EA did not give a hard look to the dangers confronting the Atlantic sturgeon. NMFS

---

[17] The Biological Assessment was prepared by the Corps in January 2009. In it, the Corps had concluded that any risks to shortnose sturgeon posed by the deepening project could be "minimize[d] and in some cases eliminate[d]," because "the majority of potential impacts would be related to the blasting activities . . . scheduled to take place in December and January of project Years 1 and 2." NMFS endorsed the Corps' findings in a Biological Opinion published in July 2009. The Biological Opinion found: "[I]n its entirety, the proposed action is likely to result in direct physical effects . . . to no more than 57 shortnose sturgeon . . . . this number represents a very small percentage of the shortnose sturgeon population in the Delaware River . . . . [T]he proposed deepening project will not appreciably reduce the likelihood of survival . . . for this species . . . ."

designated the Atlantic sturgeon as a "candidate" for the Endangered Species list in 2006, and throughout the time at issue in this litigation, it retained that classification.[18] "Candidate" species receive no statutory protection under the Endangered Species Act, but their vulnerability makes them appropriate for consideration in a NEPA review.

The EA's analysis of the Atlantic sturgeon was sufficient. The report contained two sections on "threatened and endangered species and other species of special concern," each of which contained a sub-section on the Atlantic sturgeon. The sturgeon's use of the Delaware River – from spawning, to hatching, to other migratory patterns – was analyzed in detail. Furthermore, every public comment about

---

[18] On February 6, 2012, NMFS listed the New York Bight distinct population segment ("DPS") of the Atlantic sturgeon as an Endangered Species. *See* Final Listing Rule for Gulf of Maine, New York Bight, and Chesapeake Bay Distinct Population Segments of the Atlantic Sturgeon in the Northeast Region, 77 Fed. Reg. 5880, 5909 (Feb. 6, 2012) (to be codified at 50 C.F.R. pt. 224). The New York Bight DPS includes sturgeon in the Delaware River. *Id.* at 5881, 5903, 5912. Because NMFS's endangerment listing post-dated the events in this litigation, it has no bearing on the quality of the EA. Nonetheless, we observe that it is unlikely the February 2012 listing would change the EA's conclusion that no additional SEIS was necessary for the project because the EA treated the Atlantic sturgeon as a species of "special concern," given its "candidate" species listing at that time, and analyzed its vulnerability in several discussions.

the vulnerability of the species that Riverkeeper cites in its Brief was also addressed in the EA. *See* Riverkeeper Br. at 85 (citing comments by NMFS, Prof. Dewayne Fox, and the Delaware River Basin Fish and Wildlife Management Cooperative). The Delaware River Basin Fish and Wildlife Management Cooperative filed a comment recommending the Corps "establish dredging and blasting windows that would result in the lowest probable impact to existing sturgeon populations of both Atlantic as well as shortnose." The EA adopted this proposal: "All of these windows will be met during construction of the deepening project," save for one, which was infeasible. Professor Dewayne Fox of Delaware State University advised the Corps to take into account "the large body of work . . . done primarily by both DSU and the Delaware Department of Fisheries and Wildlife" about the Atlantic sturgeon. The EA devoted three pages to the studies of Professor Fox. NMFS informed the Corps it would "recommend protective measures" for the Atlantic sturgeon. The Corps committed to using "environmental windows" and "[c]onstruction techniques" to "reduce the impacts of rock blasting on fish," and to working collaboratively with NMFS during the project design phase.[19]

---

[19] Appellants draw our attention to a recent Ninth Circuit decision in which the court invalidated a supplemental EIS for, in part, failing to "provide baseline data for many of the species, and instead plan[ning] to conduct surveys and studies as part of its post-approval mitigation measures[.]" *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011) ("*Northern Plains*"). *Northern Plains* is

Finally, New Jersey contends the EA's analysis of potential water contamination was deficient. In two ways, New Jersey argues, the EA lacked the necessary data for a robust analysis. First, it did not include up-to-date sediment samples from "bend-widening areas" in the Delaware River, which are necessary to obtain "'a worst case picture of contaminant concentrations that would potentially be in the dredged material.'" N.J. Reply Br. 19 (citing the SEIS). Second, New Jersey claims the EA omitted a "modified elutriate analysis," which was important for predicting how dredged material, stored upstream, would impact surface water quality.

Neither purported data shortcoming rises to the level of arbitrary or capricious action. The EA relied on a broad array of studies, surveys, and sediment samples to ground its analysis of the potential water contamination from the project. First, it relied on sediment samples evaluated in the SEIS, which New Jersey concedes included samples from bend-widening areas. These had shown no bioaccumulation of any significance in the river's sediment, and no potential for the

inapposite. The report in *Northern Plains* was deficient because it sought to obtain baseline data, necessary for the agency's approval of a project, from mitigation measures to be instituted after the project was underway. *Id.* at 1084. The agency put the cart before the horse. Here, the EA contained considerable baseline data on the Atlantic sturgeon, such as studies from 2003 through 2007, and relied on mitigation measures only to conclude the project could be deployed in a way that would avoid causing significant harm to the species.

deepening to increase the water's toxicity. Second, the EA "incorporated . . . by reference" the modified elutriate analysis from the SEIS, which similarly concluded that "dredging and dredged material disposal operations would not significantly impact water quality within the Delaware River." Third, the EA relied on two studies by the Corps in 2003 and 2005, analyzing "[a] total of 45 sediment cores" from the main channel and concluding there was negligible contamination. Finally, the EA relied on 162 sediment samples collected by the National Oceanic and Atmospheric Administration from intertidal and subtidal areas for a 2007 report. These samples showed the 2004 oil spill had left no lingering effects and "baseline conditions (i.e., no spill-associated service losses) [we]re reached in 14 months." Altogether, this material provided the Corps a sufficient basis from which to analyze how the project would impact water contamination in the Delaware River and from which to draw well-reasoned, non-arbitrary conclusions.[20]

---

[20] New Jersey claims it flagged the need for updated sediment samples from bend-widening areas and for a modified elutriate analyses in its public comment from January 14, 2009. Accordingly, it claims the EA's failure to include such data was indefensible, as demonstrated in the recent case of *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1157 (D.C. Cir. 2011) (holding it would have been arbitrary and capricious for the Corps to issue a FONSI that failed to address a comment raised by an expert about a threatened species, and remanding for factfinding on that issue). But New Jersey's January 14 comment had not mentioned modified elutriate

45

IV.

Riverkeeper contends the Corps' decision to proceed with the deepening project violated the Clean Water Act. First, Riverkeeper argues it violated Section 401(a), which requires recipients of federal permits who release "discharge" in navigable waters to obtain "a certification from the State in which the discharge originates or will originate." 33 U.S.C. § 1341(a)(1). The Corps never secured water certifications from New Jersey or from Delaware for the project. Second, Riverkeeper contends the Corps' actions ran afoul of Sections 313 and 404(t), which obligate federal agencies to comply with state environmental regulations when engaging in dredging operations. 33 U.S.C. § 1323(a); *id.* § 1344(t). After eight years of delay, Delaware denied the Corps two permits required by state law for users of subaqueous lands and wetlands in July 2009; nonetheless, the Corps decided to proceed. In response to Riverkeeper's challenges, the Corps contends it is entitled to two statutory exemptions codified at Sections 404(r) and 404(t) of the CWA. For the reasons stated, we hold that both exemptions attach.

---

analysis. And while it called for updated sediment samples from bend-widening areas, the EA relied upon reports assembled in 2003, 2005 and 2007, all of which included updated sediment samples. *See supra.* The Corps' judgment that these samples were sufficient to offer the agency a complete picture of water contamination merits deference.

A.

The Clean Water Act ("CWA") was enacted in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Federal Water Pollution Control Act, Pub. L. No. 92-500, § 101(a), 86 Stat. 816 (1972). Under its principal provision, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source," *see id.* § 1362(12); "navigable waters" are defined as "waters of the United States, including the territorial seas," *id.* § 1362(7); and "pollutant" is defined as including "dredged spoil, . . . rock, sand, [and] cellar dirt," *id.* § 1362(6). The Delaware River readily qualifies as a "navigable water" because it is a "relatively permanent . . . continuously flowing bod[y] of water forming geographic features that are described in ordinary parlance as . . . rivers," *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (internal quotation marks and citation omitted); and dredging qualifies as the "discharge of a pollutant" because it results in the "addition" of "dredged spoil" to a navigable water. Under Section 404(a), however, the U.S. Army Corps of Engineers may "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." *See* CWA § 404(a) (codified at 33 U.S.C. § 1344(a)). The Corps "exercises the discretion of an enlightened despot" in issuing discharge permits, *Rapanos*, 547 U.S. at 721, and considers a broad range of factors set forth in its regulations, *see* 33 C.F.R. § 320.4. But there is one statutory obligation incumbent upon the Corps. Before issuing a permit, it must

47

apply "guidelines developed by the Administrator [of the EPA], in conjunction with the Secretary [of the Army]," which prescribe a rigorous review of a project's environmental costs. CWA § 404(b)(1) (codified at 33 U.S.C. § 1344(b)); 40 C.F.R. § 230.10 *et seq.*[21]

The Clean Water Act requires federal agencies and holders of federally-issued discharge permits to comply with state and local environmental laws in two pertinent ways. First, under Section 401(a), the Act requires holders of U.S. Army Corps permits, issued pursuant to Section 404, to obtain "certifications" from the states in which the discharge into navigable waters will occur. CWA § 401(a) (codified at 33 U.S.C. § 1341(a)(1)) ("Any applicant for a Federal license or permit to conduct any activity . . . which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the applicable provisions of [other sections of this title]."). The state certification "shall become a condition of any Federal license or permit subject to the provisions of this section." 33 U.S.C. § 1341(d). Second, under Sections 313 and 404(t), the Act requires federal departments and instrumentalities to comply with state

---

[21] When the Corps seeks to undertake a project that will release discharge, it does not go through the formality of issuing a permit to itself. Instead, it follows "all applicable substantive legal requirements" under Section 404, including an application of the Section 404(b)(1) guidelines. 33 C.F.R. § 336.1(a).

environmental laws when they engage in activities that emit pollutants into navigable waters. CWA § 313 (codified at 33 U.S.C. § 1323(a)) ("Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements . . . respecting the control and abatement of water pollution . . . ."); CWA § 404(t) (codified at 33 U.S.C. § 1344(t)) ("[Every federal] agency shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to such requirements.").

But the Act also provides exceptions to the provisions cited, enacted as part of the Clean Water Act of 1977, Pub. L. No. 97-217, 91 Stat. 1566. As to the water certification requirement under Section 401(a), Section 404(r) creates an exemption for projects "specifically authorized" by Congress. *See* CWA § 404(r) (codified at 33 U.S.C. §1344(r)) ("The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise subject to regulation under this section . . . ."). As to the mandates to follow states' environmental laws, codified at Sections 313 and 404(t), the final sentence of Section 404(t) provides a partial waiver. *See* CWA § 404(t) (codified at 33. U.S.C. § 1344(t)) ("This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation."); *see also* S. Rep. No. 95-370, at 68-69 (1977) ("[C]orps dredging activities are not exempt from State

pollution abatement requirements. . . . [But this] is neither intended nor expected to result in compromising the ability of the corps to maintain navigation."). Before Section 404(t) was added in 1977, the CWA had included a provision, still in force, that similarly preserved the Corps' authority to "maintain navigation." *See* CWA § 511(a)(2) (codified at 33 U.S.C. § 1371(a)(2)) ("This chapter shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899[.]").

## B.

The Corps asserts it was relieved of the need to obtain water certifications from New Jersey and Delaware under Section 401(a) of the CWA by virtue of the "congressionally authorized" exception under Section 404(r). Riverkeeper disagrees, but we find the Corps' argument convincing.[22]

---

[22] Riverkeeper argued the Corps violated CWA § 401(a), and that CWA § 404(r) did not apply, at summary judgment in both district courts. New Jersey raises this claim for the first time on appeal. *See* N.J. Br. at 60. A party's failure to raise an issue in district court typically results in forfeiture of the claim. *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991) (holding "[i]t is well established that failure to raise an issue in the district court constitutes a waiver of the argument" unless certain "extraordinary circumstances" exist). We need not resolve whether to consider the Section 401(a) claim as to

As an initial matter, we agree with the Corps that "all of the elements of section 404(r) have been satisfied" for the deepening project. Section 404(r) provides:

> The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise subject to regulation under this section . . . if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.] and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction.

33 U.S.C. § 1344(r). Accordingly, to trigger Section 404(r), there must be a federal project specifically authorized by Congress. The deepening project unquestionably qualifies, as Congress clearly authorized it in the Water Resources Development Act of 1992, Pub. L. No. 102-580, § 101(6),

New Jersey because we find it to lack merit, when evaluated as to Riverkeeper.

106 Stat. 4797, 4802 ("[T]he following projects for water resources development and conservation and other purposes are authorized to be carried out by the Secretary . . . . The project for navigation, Delaware River Mainstem and Channel Deepening, Delaware, New Jersey, and Pennsylvania: Report of the Chief of Engineers, dated June 29, 1992, at a total cost of $294,931,000, with an estimated Federal cost of $195,767,000 . . . ."). Section 404(r) also requires that "information on the effects of [the project], including consideration of the guidelines developed under subsection (b)(1)" be "included in an environmental impact statement . . . submitted to Congress before the actual discharge of dredged or fill material . . . and prior to either authorization of such project or an appropriation of funds for such construction." 33 U.S.C. § 1344(r). This prerequisite was met. The Corps transmitted an EIS to Congress in June 1992 that had been prepared pursuant to NEPA and that included, as Section 404(r) directs, a "consideration of the guidelines developed under subsection (b)(1)." The transmission occurred five months before Congress authorized the project or appropriated funds, see WRDA, 106 Stat. at 4797 (showing a date passage of October 31, 1992), and years before any "actual discharge" occurred.

Nonetheless, Riverkeeper contends Section 404(r) does not apply for two reasons. The first is that the 1992 EIS was incomplete because it lacked a Record of Decision. The Record of Decision was issued in December 1992, two months after the WRDA was enacted. But this is of no moment. Section 404(r) mandates that "[an] environmental impact statement . . . [prepared] pursuant to the National

Environmental Policy Act" be provided to Congress and that it "includ[e] consideration of the guidelines developed under subsection (b)(1)"; it never mentions a Record of Decision. The absence of a Record of Decision in the congressional submission violates no statutory command. Furthermore, the purpose of Section 404(r) is for Congress to receive sufficient information in order to make an informed judgment about whether to authorize a federal project. In cases like this, where an EIS is produced after a full-fledged notice and comment process, bears the title of "final" impact study, and is transmitted to Congress with an explicit request for a Section 404(r) exemption, that purpose has been achieved.[23]

---

[23] The recent case of *Board of Mississippi Levee Commissioners v. EPA*, 674 F.3d 409 (5th Cir. 2012) is consistent with our holding. In that case, the Fifth Circuit held that Section 404(r) of the CWA had not been triggered when a report provided to Congress lacked, among other things, a Record of Decision. The absence of a Record of Decision was one factor among several that persuaded the court to find the report had not been an agency's "final EIS." In addition to the lack of a Record of Decision, the agency's transmittal letter to Congress plainly stated the report was not final. *Id.* at 414-15. Four months after the report was transmitted to Congress, the Chief of Engineers prepared a "final report" for the same project. *Id.* at 415. And because the original report sent to Congress was not in the record, the court could not determine whether it was labeled a "final" EIS. The Fifth Circuit held these factors collectively proved the document provided to Congress had not been a "final EIS" and accordingly, Section

Second, Riverkeeper contends the SEIS invalidated whatever exemption had been attained by virtue of the EIS. Riverkeeper claims the SEIS stands as proof that by 1997, the deepening project had changed to such an extent and new information had become available to such a degree, that Congress's 1992 statutory authorization was no longer binding. But nothing in the text of Section 404(r) suggests that once the exemption attached, it lapses. The plain language of the statute states that when Congress "specifically authorizes" a federal project, following its consideration of an EIS, the exemption is triggered. 33 U.S.C. § 1344(r). There is no requirement that the agency submit supplemental NEPA reports so Congress can reauthorize the venture. Furthermore, the SEIS's central findings were that despite the developments between 1992 and 1997 – e.g., modifications to the project, new scientific information that became available – the conclusions in the EIS still applied. The SEIS stated: "[R]efinements to the authorized plan that were recommended in the 1992 Interim Feasibility Report . . . . did not alter the environmental impacts that were presented in the Final Environmental Impact Statement" and the project still "compl[ied] with the 404(b)(1) guidelines." There was no need to solicit reauthorization from Congress because the project had not changed in a material way.

_____

404(r) had not been triggered. *Id.* at 419. Here, the EIS transmitted to Congress in June 1992 was entitled "Final Interim Feasibility Report," was produced after a full notice and comment process, and was sent with a transmittal letter requesting the Section 404(r) exemption.

In sum, Section 404(r) of the CWA was triggered in 1992 and did not lapse by virtue of the Corps' subsequent NEPA analyses. The Corps was relieved of the federal permitting requirement under Section 404, *see* 33 C.F.R. § 323.4(d) (explaining that "[f]ederal projects which qualify under the criteria in section 404(r) of the CWA are exempt from section 404 permit requirements"), as well as from the water certification requirement under Section 401(a), *see* 33 U.S.C. § 1341(a)(1) (stating the certification mandate attaches to "applicant[s] for a Federal license or permit to conduct any activity"). The fact that the Corps attempted to work collaboratively with New Jersey and Delaware for several years does not undermine its lawful reliance on the Section 404(r) exemption.

## C.

The Corps contends it was relieved of Sections 313 and 404(t) of the Clean Water Act, which required it to obtain special Delaware permits, because it was entitled to a statutory exemption codified at Section 404(t). We afford *Skidmore* deference to the Corps' invocation of Section 404(t) and find its interpretation of the statute reasonable. We also find the Corps was neither arbitrary nor capricious in deciding to invoke Section 404(t).

The Delaware Subaqueous Lands Act "empower[s] the Secretary to deal with or dispose of interest in public subaqueous lands." 7 Del. Code Ann. tit. 7, § 7201. Under that authority, DNREC promulgated regulations instructing that "[n]o . . . project which may potentially impact the public

interest in the use of tidal or navigable waters [or] contribute to water pollution . . . shall be undertaken on public or private subaqueous lands unless approval has been obtained from the Department." 7 Del. Admin. Code § 7504-2.7. The Delaware Wetlands Act provides that "[a]ny activity on the wetlands requires a permit from [DNREC]." 7 Del. Code Ann. tit. 7, § 6604(a). The word "activity" is defined to include dredging operations. *Id.* § 6603. Both permit requirements extend to the deepening project because it calls for the disposal of dredged material at three subaqueous land-sites in Delaware and for a wetlands restoration project in Delaware.[24]

---

[24] The record reveals some confusion as to whether the wetlands permit was necessary and as to whether the Corps' 2001 application was made pursuant to the Wetlands Act or solely the Subaqueous Lands Act. Neither party has raised this issue on appeal. We assume both were required and that the Corps applied for both.

It is also worth noting the permits mandated by the Subaqueous Lands and Wetlands Acts were not affected by the exemption codified at Section 404(r). Section 404(r) relieves projects "specially authorized" by Congress from the permitting requirements in Section 404. One of those requirements, codified at Section 401(a), is to obtain a state water certification. 33 U.S.C. § 1341(a)(1). But for a water certification to fall under Section 401(a), it must be issued by a state body operating a "permit program" that regulates "discharges into navigable waters" and that has been approved by the EPA. 33 U.S.C. § 1342(b). The Delaware Subaqueous Lands and Wetlands Acts create permit programs

The Corps applied for subaqueous lands and wetlands permits in 2001. For eight years, Delaware stalled on its application. In light of Sections 313 and 404(t) of the CWA, which obligate federal agencies to follow states' environmental laws, the Corps was at an impasse. Accordingly, it invoked the exemption set forth in Section 404(t) in the spring of 2009. That provision provides: "This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation." CWA §404(t) (codified at 33 U.S.C. § 1344(t)). On April 30, 2009, the Assistant Secretary of the Army for Civil Works signed a Memorandum of Record declaring the "failure to construct the 45' Project as authorized by Congress in 1992 has . . . impaired the Secretary of the Army's authority to maintain navigation . . . ." The Assistant Secretary was "direct[ing] the Corps to proceed with construction of the project." The Memorandum of Record cited Section 404(t) of the CWA as the authoritative basis for its action.

---

for the use of subaqueous lands and wetlands, neither of which is approved by the EPA under § 1342. Accordingly, the Delaware Subaqueous Lands and Wetlands Acts are "other state requirements" that do not fall under Section 404(r) and that holders of federally-issued permits are required to follow. *See* 33 C.F.R. § 323.4(d) ("Federal projects which qualify under the criteria contained in section 404(r) of the CWA are exempt from section 404 permit requirements, but may be subject to other State and Federal requirements.").

The Corps' invocation of Section 404(t) was entitled to *Skidmore* deference. In cases involving an agency's legal interpretation of a statute, the amount of deference afforded is governed by the *Chevron* framework. First, a court asks "whether Congress has directly spoken to the precise question at issue." *Chevron, USA, Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. Second, a court asks whether, if the statute is ambiguous, the agency has rendered "a permissible construction." *Id.* at 843. A court is more likely to find the agency's interpretation permissible if there is a "complex and highly technical regulatory program," *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 282 (3d Cir. 2002) (citations and quotation marks omitted), or if the agency has employed formal procedures, such as notice and comment rulemaking, *see Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). If the court declines to extend *Chevron* deference, it may nonetheless extend a lesser degree deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

Before resorting to *Skidmore* deference, we observe that it is likely the phrase "maintain navigation" encompasses activities, such as the deepening project, that improve a body of water in order to keep navigation levels steady in light of changes to commercial markets, technology, and environmental conditions. While neither "maintain navigation" nor its component words are explicitly defined in the Clean Water Act, there is no evidence that Congress

58

intended the phrase to encompass only those activities that preserve bodies of water as they existed in 1977, when the statutory language was inserted. *See* Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566. Arguably, such a reading would be irrational. Given that navigation evolves over time, limiting the Corps to preserving rivers as they were in 1977 could have the counter-productive effect of preventing it from "maintaining" ship traffic. The dictionary definitions also suggest the phrase reaches improvement projects. "Maintain" is defined as "to keep in an existing state (as of repair, efficiency or validity): preserve from failure or decline," and "navigation" as "ship traffic or commerce." *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2005). These are capacious definitions; preserving "ship traffic" from "failure or decline" could call for a wide range of activities, including repairs, modifications, and improvements.

Nonetheless, were we to find the statutory text ambiguous, *Skidmore* deference would be warranted and would support the Corps' action.[25]  A court will afford

---

[25] We need not decide whether *Chevron* deference should attach. Riverkeeper contends it should not, given the informality of the agency's action. Namely, it points out that the Corps did not engage in notice and comment rulemaking when it invoked Section 404(t), but acted on the basis of a Memorandum of Record. *See United States v. Mead Corp.*, 533 U.S. 218, 230-31 (2001) (holding "the want of" notice and comment procedures often compels in favor of not deferring to the agency). We need not settle this debate. At

*Skidmore* deference upon consideration of "the thoroughness evident in [an agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. The most important considerations are whether the agency's interpretation "is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and purpose of the Act." *Cleary ex. rel. Cleary v. Waldman*, 167 F.3d 801, 808 (3d Cir. 1999). The Corps' interpretation of Section 404(t) is entitled to deference under these standards. Its reading did not contradict any of the agency's prior statements about Section 404(t) – the Corps had only once before invoked the exception, and in a context different from but not in conflict with that here. *See In re Operation of Mo. River Sys. Litig.*, 418 F.3d at 915 (affirming the Corps' invocation of Section 404(t) to release water from a reservoir and support downstream navigation in the Missouri River). The interpretation also was reasonable "given the language and purpose" of the statute, because the view that "maintain navigation" extends to activities necessary to maintain current levels of ship traffic, which is what the EA forecasted the project would do by enabling shippers to employ a larger vessel fleet, *see supra* note 5, is consistent with the plain meaning of "maintain" – i.e., to "preserve from failure or

the least, *Skidmore* deference is due, and is sufficient to support the Corps' action.

decline." Finally, the canon that "[w]aivers of immunity must be construed strictly in favor of the sovereign," *see U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (internal quotation marks and citation omitted), supports the Corps' interpretation. Allowing "maintain navigation" to encompass the deepening project would have the effect of limiting the federal government's waiver of sovereign immunity in the first part of Section 404(t).

Riverkeeper contends *Skidmore* deference is improper. First, it argues that Congress intended Section 404(t)'s "maintain navigation" authority to be "linked with the Corps' historical authorities under the Rivers and Harbors Act of 1899 . . . . to maintain navigation by preventing the obstruction of navigable waterways." Riverkeeper Br. at 47. In other words, Congress only intended for "maintain navigation" to protect the Corps' mandate to do things it did in 1899 – such as removing physical blockages from rivers or preventing activities that would impede the flow of waterborne commerce. The statutory language, however, suggests the opposite. Congress did not include a reference to the Rivers and Harbors Act in the text of Section 404(t) as it had done when it codified Section 511 in 1972. *Compare* CWA § 404(t) ("This section shall not be construed as affecting or impairing the authority of the Secretary to maintain navigation."), *with* CWA § 511(a)(2) ("This chapter shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899[.]"). This shows that if anything, Congress intended Section 404(t) to reach more broadly than the programs the Corps managed in

61

1899 and to encompass the full scope of the Corps' activities in 1977.[26]

---

[26] Furthermore, the Corps had significantly broader authority in 1899 than Riverkeeper acknowledges. The Rivers and Harbors Act contains twenty-eight pages of appropriations to the Corps for conducting "improvement" projects in the nation's waterways. *See* Rivers and Harbors Act of 1899, ch. 425, 30 Stat. 1121, 1121-1149 ("Be it enacted . . . [t]hat the following sums of money be, and are hereby, appropriated . . . to be expended under the direction of the Secretary of War and the supervision of the Chief of Engineers, for the construction, completion, repair, and preservation of the public works hereinafter named: *Improving* Moosabec Bar, Maine: Completing improvement, eleven thousand dollars. . . . For *improvement* of the Buffalo entrance to Erie Basic and Black Rock Harbor, New York . . . . *Improving* New York Harbor, New York . . . *by a deep channel*, two thousand feet wide and forty feet deep from the Narrows . . . one million dollars . . . *Improving* Port Chester Harbor, New York: Twenty-five thousand dollars, *to be expended in enlarging the channel* below and up to Town Dock to a depth of twenty feet . . . . *Improving* the outer bar, Brunswick Georgie: C.P. Goodyear, the contractor with the Government of the United States, *to deepen the outer bar* of Brunswick . . . . *Improving* harbor at Pensacola, Florida: . . . seventy thousand dollars . . . *to be used toward securing a channel depth* of thirty feet . . . . *Improving* harbor at Mobile Alabama: . . . with the view of *ultimately securing a channel twenty-three feet deep* and one hundred feet wide at the bottom . . . . *Improving* Galveston

Finding the Corps' interpretation of Section 404(t) worthy of deference under *Skidmore*, our final step is to determine whether the agency's invocation of the exemption was arbitrary or capricious. *See* 5 U.S.C. §706(2)(A); *Robert Wood Johnson Univ. Hosp.*, 297 F.3d at 284. It was neither. After studying commerce patterns in the Delaware River for two decades and publishing three extensive reports, in 1992, 1997, and 2009, the Corps concluded a five foot deepening project was necessary to preserve the current flow of navigation in the Delaware River. As the EA put it, this project was essential to "improve the economic efficiency of ships moving through the Delaware ports," help shippers "more efficiently apportion operating costs," and "allow current dry bulk and container vessels to carry more cargo as well as allow a fleet shift in the charger dry bulk market." The Corps' consideration of the issue was "thorough" and its determination was reasonable. *See Skidmore*, 323 U.S. at 140. Meanwhile, Delaware had sat on its permit application for eight years and, in December 2008, told the Corps it would need to submit an entirely new application. Given that the first phase of the project was scheduled, as of April 2009, to begin in August 2009, the Corps was warranted in invoking

---

Ship Channel . . . *by dredging* or otherwise . . . . *Deepening the channel* from Galveston Harbor to Texas City, Texas . . . ." (emphases added)). Accordingly, even if Sections 511 or 404(t) of the CWA circumscribed the Corps' "maintain navigation" authority to its historical authorities in 1899, the latter included the execution of improvement and channel deepening projects.

63

the exception to save the project from postponement or indefinite delay.

V.

New Jersey contends the Corps acted arbitrarily and capriciously under the Coastal Zone Management Act when it decided, as memorialized in a Memorandum of Record issued on November 9, 2009, to proceed with the project without providing supplemental consistency determinations to Delaware or New Jersey. Because "significant new information" had become available since the Corps submitted its initial CZMA determinations in 1997, New Jersey contends, supplemental determinations were required. According to New Jersey, the Corps' conclusion to the contrary was arbitrary and capricious because it was grounded in the procedurally and substantively flawed EA.

A.

The Coastal Zone Management Act of 1972 was enacted "to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations," and to "encourage and assist the states to exercise effectively their responsibilities in the coastal zone through the development and implementation of management programs to achieve wise use of the land and water resources of the coastal zone[.]" 16 U.S.C. § 1452(1), (2). States' "management programs" must provide for "the protection of natural resources," as well as "improved coordination between State and Federal coastal zone

64

management agencies." *Id.* § 1452(2)(A), (J). Federal agencies conducting activities "within or outside the coastal zone" are required to provide the relevant state(s) with a "determination" that the activity "shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *Id.* § 1456(c)(1)(A), (C). The state(s), in turn, must either concur with or object to the federal agency's determination. 15 C.F.R. § 930.41(a). A state "cannot unilaterally place an expiration date on its concurrence." *Id.* § 930.41(d). Moreover, even if a state objects, the federal agency can proceed over the state's objection if it "conclude[s] that its proposed action is fully consistent with the enforceable policies of the management program." *Id.* § 930.43(d)(2).

The CZMA regulations require federal agencies to supplement their consistency determinations if "the proposed activity will affects any coastal use or resource substantially different than originally described." *Id.* § 930.46(a). "Substantially different" effects are "reasonably forseeable," and thereby warrant a supplemental determination, if: (1) the agency "makes substantial changes in the proposed activity that are relevant to the manageable program enforceable policies"; or (2) there are "significant new circumstances or information relevant to the proposed activity and [its] effect on any coastal use or resources." *Id.* § 930.46(a)(1), (2).

B.

The Corps' conclusion in the Memorandum of Record

65

that it need not provide supplemental consistency determinations to either state under the CZMA was reasonable. Federal agencies are required to submit supplemental determinations in either of two instances: if the agency makes "substantial changes in the proposed activity," or if "significant new circumstances or information relevant to the proposed activity and [its] effect on any coastal use or resource" arise. *Id.* § 930.46(a)(1), (2). Relying on the EA, the Corps concluded neither situation was present. With respect to "substantial changes" to the project, the Memorandum of Record identified three alterations that had been made since 1997, when the original CZMA consistency determinations were transmitted: (i) four disposal sites identified in the SEIS had been eliminated; (ii) sand would now be deposited directly onto Broadkill Beach, rather than initially stockpiled offshore; and (iii) a planned beneficial use site at Egg Point Island was no longer needed. None of these changes were "substantial," the Corps determined, because the 2009 EA had found that none would cause serious impacts to the environment. With respect to "significant new circumstances or information," the Memorandum of Record noted both the oil spill of 2004 and the recent surveys showing an expansion of the shortnose sturgeon in the region. But again, relying on the EA and a 2009 Biological Assessment the agency prepared for NMFS, the Corps concluded neither development was "significant" because neither would cause adverse environmental consequences not anticipated in the SEIS. The Corps was justified in relying on these recent and thorough reports. *See supra*. The agency's conclusion that 15 C.F.R. § 930.46(a) had been satisfied, and

that no supplemental consistency determinations were required, was neither arbitrary nor capricious.

## VI.

For over twenty years, the Corps has devoted substantial efforts to evaluating the proposed five foot deepening project for the Delaware River. It has published three comprehensive NEPA reports, received multiple rounds of public comments, and had immeasurable communications with the relevant state and federal agencies. Its decision in 2009 to proceed with the project was consistent with NEPA, the CWA, and the CZMA. Accordingly, we will affirm the judgments of the District Courts of New Jersey and Delaware.