PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2526
_____

MARK W. HAGANS,

Appellant

v.

COMMISSIONER OF SOCIAL SECURITY
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 2-10-cv-01951)
District Judge:  Honorable Faith S. Hochberg
_____

Argued November 17, 2011
_____

Before:  FUENTES and CHAGARES, Circuit Judges, and
POGUE, Chief Judge.[1]

(Opinion filed:  September 14, 2012)

Joel M. Solow, Esq. (Argued)
Freeman & Bass
24 Commerce Street
7th Floor
Newark, NJ  07102

      Counsel for Appellant

_____

[1]  The  Honorable  Donald  C.  Pogue,  Chief  Judge,  United
States Court of International Trade, sitting by designation.

1

Joanne Jackson, Esq.
Sathya Oum, Esq. (Argued)
Social Security Administration
Office of General Counsel
Region II -3904
26 Federal Plaza
New York, NY  10278

      Counsel for Appellee

_____

OPINION

_____

CHAGARES, <u>Circuit</u> <u>Judge</u>.

Mark Hagans appeals the cessation of his Social Security disability insurance benefits following a determination by the Social Security Administration ("SSA") that he was no longer disabled.  Hagans argues the District Court erred by reviewing his disability status as of September 1, 2004 — the day on which, according to the SSA, Hagans's disability ceased.  This contention requires us to decide what level of deference, if any, we should afford the SSA's Acquiescence Ruling interpreting the cessation provision of the Social Security Act, 42 U.S.C. § 423(f), as referring to the time of the SSA's initial disability determination.  Hagans further argues that substantial evidence does not support the SSA's conclusion that he was not fully disabled as of September 1, 2004.  For the following reasons, we will affirm.

I.

Until January 2003, Mark Hagans worked as a security guard for a federal agency and as a sanitation worker for the city of Newark.  That month, however, when he was 44 years old, Hagans began suffering from chest pains.  He required immediate open-heart surgery to repair a dissecting aortic aneurysm, a potentially life-threatening condition that occurs when a tear in the aorta's inner layer allows blood to enter the

2

middle layer. Hagans was hospitalized for the surgery and recovery during intermittent periods between January 29, 2003, and February 28, 2003. He then spent approximately three months in a rehabilitation center, where he underwent physical and speech therapy. He left this facility sometime in April or May of 2003.

In addition to his heart ailment, Hagans claims he has underlying medical problems relating to his cerebrovascular and respiratory systems, as well as hypertension and dysphagia (difficulty in swallowing). Hagans also complains of other issues, such as insomnia and back pain, which he alleges affect his ability to stand, sit, and lift. He has also been diagnosed with depression.

Hagans's initial application for disability benefits was granted and he began receiving benefits as of January 30, 2003. On September 21, 2004, however, pursuant to an updated Residual Function Capacity ("RFC") assessment showing Hagans's condition had improved, the SSA determined that Hagans was no longer eligible for benefits because his disability had terminated on September 1, 2004. Hagans's appeal to a Disability Hearing Officer was denied. Hagans continued to pursue an appeal and received a hearing before an Administrative Law Judge ("ALJ") in September 2008, at which he was unrepresented by counsel.[2]

The record reflects that Hagans received a great deal of medical care between his surgery in January 2003 and the termination of his benefits in September 2004. The ALJ considered several evaluations of Hagans's condition, most of which were completed in mid-2004. For instance, the ALJ reviewed an August 31, 2004, report from Dr. Ramesh Patel, Hagans's treating physician. Dr. Patel diagnosed Hagans with obesity, post-surgery illness, hypertension, hearing problems, possible arthritis of the neck, and shortness of breath. This report showed that an EKG of Hagans's heart was normal and a chest X-ray indicated clear lungs and no

---

[2] Hagans's hearing had originally been scheduled for May 14, 2008, but it was adjourned so that Hagans could obtain counsel. He again appeared unrepresented on the rescheduled date, and the hearing proceeded without counsel.

sign of heart failure. Dr. Patel indicated Hagans's range of motion was limited, but did not opine on his ability to perform work-related activities.[3] The ALJ also considered the evaluation of Dr. Burton Gillette, the SSA's staff physician, which was performed on September 15, 2004. Dr. Gillette's evaluation included an RFC assessment which indicated that Hagans could not stand or walk for more than four hours per day, but could sit for about six hours during an eight-hour day and had improved lifting abilities. Further, the ALJ considered the evaluation of Ernest Uzondu, a disability adjudicator, conducted on the same day as Dr. Gillette's RFC assessment. Uzondu determined that Hagans could not perform his past relevant work, but that he was able to perform other work. Finally, the ALJ considered an internal medicine evaluation from Dr. David Tiersten conducted on March 16, 2006. In this 2006 evaluation, Dr. Tiersten diagnosed Hagans with obesity, post-surgery illness, chest pain, back pain, leg pain, and hypertension, but found that Hagans did not have significant limitations to prevent him from working.

Although Hagans claims he is limited to standing for 4-5 minutes, sitting for 30 minutes, walking only at a slow pace, and lifting no more than ten pounds, the record reflects disagreement among the doctors about Hagans's abilities. A vocational expert testified that there were jobs available that someone with Hagans's infirmities could perform, such as ticket seller, assembler of small products, and garment sorter. At the time of the ALJ hearing, Hagans represented that he spent his time watching television, helping at church, napping, and visiting a nearby park. He claims he requires assistance shaving and showering. As of September 1, 2004, he had not engaged in any substantial gainful activity following his heart surgery.

---

[3] Approximately two years later, Dr. Patel examined Hagans and concluded he was "totally and permanently disabled." Soc. Sec. R. 230–31. Dr. Patel reiterated that Hagans suffered from the same ailments but did not explain why his assessment had become so dire during the two intervening years.

On February 26, 2009, the ALJ issued a decision finding that Hagans's disability had ceased on September 1, 2004. Specifically, the ALJ found that Hagans's condition had improved and he was capable of engaging in substantial gainful activity, although he could not perform his past relevant work. On May 21, 2009, the Appeals Council denied review, which rendered the ALJ's opinion the final decision of the SSA.

Hagans then filed the instant action. On April 8, 2011, the District Judge affirmed the SSA's decision that Hagans's eligibility for disability benefits ended on September 1, 2004. Hagans has continued to receive benefits pending the outcome of this appeal. Hagans also filed a new application for disability insurance benefits on January 20, 2010.[4]

## II.

The District Court had jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

We exercise plenary review over all legal issues. Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). We review an ALJ's decision under the same standard of review as the District Court, to determine whether there is substantial evidence on the record to support the ALJ's decision. See 42 U.S.C. § 405(g); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). Substantial evidence has been defined as "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate." Plummer, 186 F.3d at 427 (quotations marks omitted). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).

## III.

---

[4] This application was originally dismissed based upon a finding of res judicata, but its current status is unclear.

We begin with the issue to which we will devote the bulk of this opinion: Hagans's assertion that the District Court erred by finding that the relevant date for determining whether he continued to be disabled was the date on which the SSA asserts that his disability had ceased — September 1, 2004 — rather than the date of the ALJ's hearing or the date of the ALJ's ruling (September 22, 2008 or February 26, 2009, respectively). Use of one of these later dates would bolster Hagans's claim for disability benefits because he had advanced into a different age category by the time of the ALJ's hearing.[5] The SSA contends that review of Hagans's disability should be confined to the date on which the SSA first found that Hagans was no longer disabled — that is, September 1, 2004.[6]

The provision we must interpret to resolve this dispute is 42 U.S.C. § 423(f), which is entitled "Standard of review for termination of disability benefits." This section provides:

> A recipient of benefits . . . may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment

---

[5] Specifically, in September 2004 Hagans was in his mid-40s, which is considered a "younger individual" according to the Social Security regulations. 20 C.F.R. Part 404, Subpart P, App. 2. At the time of the ALJ hearing, however, he was 50 years old, which placed him in the "closely approaching advanced age" category. Id.

[6] We note that the SSA did not issue its decision finding that Hagans was disabled as of September 1, 2004 until three weeks later, on September 21, 2004. It would be a rare case in which this three-week period had some impact on the analysis of whether a benefits recipient remained disabled, and, in this case, it has none. We will thus use the date on which Hagans's disability purportedly ceased — September 1, 2004 — for the purposes of our analysis. We need not resolve what should happen when there is an analytically relevant distinction between the date of the SSA's decision and the date of cessation. To the extent that we refer to "the date on which the SSA found that Hagans's disability had ceased," we intend that phrase to mean September 1, 2004.

on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by--

**(1)** substantial evidence which demonstrates that--

**(A)** there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and

**(B)** the individual is **now able** to engage in substantial gainful activity . . .

Any determination under this section shall be made on the basis of all the evidence available in the individual's case file, including new evidence concerning **the individual's prior or current condition** which is presented by the individual or secured by the Commissioner of Social Security.

Id. (emphasis added).

In support of its position, the SSA asserts that we should follow the Acquiescence Ruling it issued in 1992, which interpreted § 423(f) as requiring the evaluation of a benefits recipient's disability status as of the time that the SSA first determined that cessation of benefits was proper. Specifically, the ruling stated:

SSA interprets the term "current," as used in the statutory and regulatory language concerning termination of disability benefits, to relate to the time of the cessation under consideration in the initial determination of cessation. In making an initial determination that a claimant's disability has ceased, SSA considers the claimant's condition at the time SSA is making the initial determination. In deciding the appeal of that cessation determination, the Secretary considers

7

what the claimant's condition was at the time of the cessation determination, not the claimant's condition at the time of the disability hearing/reconsideration determination, ALJ decision or Appeals Council decision. However, if the evidence indicates that the claimant's condition may have again become disabling subsequent to the cessation of his or her disability or that he or she has a new impairment, the adjudicator solicits a new application.

Social Security Acquiescence Ruling 92-2(6), 57 Fed. Reg. 9262 (Mar. 17, 1992) (hereinafter "AR 92-2(6)"). We must decide how, if at all, this ruling should affect our analysis.[7]

## A.

We begin with the Supreme Court's watershed decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which dramatically increased the level of deference courts must generally give to administrative agencies' interpretations of statutes. Chevron requires courts to conduct a two-step inquiry. Under the first step, "[w]hen a court reviews an agency's construction of the statute which it administers," it must ask "whether Congress has directly spoken to the precise question at issue." Id. at 842. If Congress has resolved the question, the clear intent of Congress binds both the agency and the court. Id.; see also Reese Bros., Inc. v. United States, 447 F.3d 229, 238 (3d Cir. 2006) ("Under Chevron, [if] the congressional intent is clear . . . , the inquiry

---

[7] Neither party addressed this issue in its brief. We therefore requested supplemental letter briefs from both parties following oral argument. We were particularly interested in learning whether the SSA had employed the policy outlined in AR 92-2(6) prior to the issuance of that ruling. The SSA's letter brief cited no evidence indicating the existence of the policy prior to 1992. Accordingly, we must assume the policy was formulated contemporaneously with the issuance of the AR.

ends; the court and agency 'must give effect to the unambiguously expressed intent of Congress.'" (quoting Chevron, 467 U.S. at 843–44)). Under the second step, if "Congress has not directly addressed the precise question at issue," because "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The agency's interpretation will prevail so long as "it is a reasonable interpretation of the statute — not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts." Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 218 (2009).

This presumption of strong deference serves several goals. As the Court explained in Chevron, affording agencies significant discretion to interpret the law they administer recognizes the value of agency expertise and the comparatively limited experience of the judiciary where an interpretation requires specialized knowledge. 467 U.S. at 865. Moreover, the Chevron doctrine promotes national uniformity in regulatory policy, thereby enabling agencies to avoid the difficulty of enforcing different rules depending on the jurisdiction — a benefit that the SSA has cited as the primary reason for its issuance of Acquiescence Rulings. See Social Security Disability Insurance Program: Hearing Before the Senate Comm. on Finance, 98th Cong., 2d Sess. 115 (Jan. 25, 1984) (statement of SSA Commissioner Martha A. McSteen) (testifying that the SSA's "policy of nonacquiescence is essential to insure that the agency follows its statutory mandate to administer [the Social Security] program in a uniform and consistent manner").

Where Chevron deference is inappropriate, a court may instead apply a lesser degree of deference pursuant to Skidmore v. Swift & Co., 323 U.S. 134 (1944). More will be said about the nature of a Skidmore analysis, but for now it suffices to note that Skidmore requires a court to assign a weight to an administrative judgment based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

9

pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.[8]

B.

Regardless of whether we apply Chevron or Skidmore deference, our initial inquiry requires us to determine whether § 423(f) is ambiguous. We conduct this ambiguity analysis as

---

[8] There is one other deference doctrine worthy of a brief mention. In Auer v. Robbins, 519 U.S. 452, 462 (1997), the Supreme Court considered the Secretary of Labor's interpretation of a regulation (not a statutory provision) promulgated pursuant to the Fair Labor Standards Act. Despite the fact that the Secretary's interpretation came "in the form of a legal brief," the Court held it was nonetheless entitled to strong deference because it was not a "post hoc rationalization" and it represented the agency's "fair and considered judgment." Id. The Court explained that deference was warranted because "requiring the Secretary to construe his own regulations narrowly would make little sense, since he is free to write the regulations as broadly as he wishes, subject only to the limits imposed by the statute." Id. at 463.

The liberal standard for deference under Auer might arguably apply to the parallel regulation to § 423(f), 20 C.F.R. § 404.1594 (which replaces the statutory phrase "now able to engage in substantial activity" with "currently able to engage in substantial activity"), were it not for the Supreme Court's decision in Gonzales v. Oregon, 546 U.S. 243 (2006). There, the Court declined to give strong deference to an interpretive memorandum by the Attorney General because the regulation reviewed in the memorandum used the same terminology as the original statute from which it was derived. The Court explained that this type of "parroting regulation" does not receive deference under Auer because "[a]n agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." Id. at 256–58. Given the similarity between the disputed terms occurring in the statute and the regulation, AR 92-2(6) cannot receive deference under Auer.

10

a matter of statutory interpretation which is necessarily antecedent to our deference inquiry because we need reach the deference question <u>only</u> if we find the statutory language is ambiguous. See <u>Del. Dep't of Natural Res. & Envtl. Control v. U.S. Army Corps of Eng'rs</u>, 685 F.3d 259, 284 (3d Cir. 2012) (hereinafter "<u>DDNR</u>") (suggesting a deference analysis need only be "resort[ed] to" when the statutory text is ambiguous). If we decide that the statute is unambiguous, we are bound to give effect to the words of Congress. <u>Chevron</u>, 467 U.S. at 843.[9]

Our goal when interpreting a statute is to effectuate Congress's intent. <u>Rosenberg v. XM Ventures</u>, 274 F.3d 137, 141 (3d Cir. 2001). "Because we presume that Congress' intent is most clearly expressed in the text of the statute, we begin our analysis with an examination of the plain language of the relevant provision." <u>Reese Bros.</u>, 447 F.3d at 235. In trying to divine the intent of Congress, we should consider the entire scope of the relevant statute. See <u>United States v. Tupone</u>, 442 F.3d 145, 151 (3d Cir. 2006) ("The Supreme Court has stated consistently that the text of a statute must be considered in the larger context or structure of the statute in which it is found."). When a statute is "complex and contains many interrelated provisions," it may be "impossible to attach a plain meaning to provisions in isolation." <u>Cleary ex rel. Cleary v. Waldman</u>, 167 F.3d 801, 807 (3d Cir. 1999) (holding that the Medicare statute meets this criteria and is therefore ambiguous).

Two other courts have found that the terms "current" and "now" contained in § 423(f) are unambiguous. The first case to address whether a disability benefits recipient's eligibility must be evaluated from the date of cessation or the time of the ALJ's hearing was <u>Difford v. Secretary of Health & Human Services</u>, 910 F.2d 1316 (6th Cir. 1990). There, the Court of Appeals for the Sixth Circuit held that the ALJ should adjudicate the claimant's disabilities at the time of his

---

[9] The fact that we are conducting an ambiguity analysis that is indistinguishable from the first step of <u>Chevron</u> should not be misconstrued as a decision to apply <u>Chevron</u> deference. As we have made clear above, we do not reach the deference question unless the statute is ambiguous.

11

or her hearing, such that if the claimant were found to be disabled at the time of the hearing — even if he was not disabled as of the cessation date — his benefits should not be terminated. The court placed special emphasis on the fact that § 423(f) requires an ALJ to review the recipient's "current" status as of "now," which it found to be a clear, unambiguous indication that Congress had intended the ALJ's review to focus on the benefits recipient at the time of the ALJ's hearing. Id. at 1320.[10]

The second case to find the terms "now" and "current" unambiguous was Aikens v. Shalala, 956 F. Supp. 14, 20 (D.D.C. 1997). The district court adopted the Court of Appeals for the Sixth Circuit's view and thus required an evaluation of the recipient contemporaneous with the ALJ's hearing. The court explained:

> The plain meaning of the statute, the legislative history and the SSA's own regulations compel [the Sixth Circuit's construction of the words "now" and "current"]. Although the Secretary faults the Sixth Circuit for focusing on the plain meaning of the words "now" and "current," it is an "elementary principle of statutory construction that ordinarily the plain meaning of statutory language controls, i.e., 'words should be given their common and approved usage.'"

Id. at 20–21 (quoting United Scenic Artists v. NLRB, 762 F.2d 1027, 1032 n.15 (D.C. Cir. 1985).

Two years later, however, the Court of Appeals for the Seventh Circuit disagreed. In Johnson v. Apfel, 191 F.3d 770 (7th Cir. 1999), the court held that § 423(f) was ambiguous

---

[10] AR 92-2(6) was issued to clarify the SSA's disagreement with Difford. The Court of Appeals for the Sixth Circuit had an opportunity to reconsider Difford after the issuance of AR 92-2(6), but it elected not to do so in light of the factual differences between that case and Difford. See Henley v. Comm'r of Soc. Sec., 58 F.3d 210 (6th Cir. 1995). Thus, Difford remains good law in the Sixth Circuit.

when its terminology was viewed in the context of the entire Social Security Act. The court adopted the SSA's interpretation of § 423(f), which, in contrast to the interpretation reached in Difford and Aikens, asserted that "by using the terms 'now' and 'current,' Congress was merely distinguishing between the time when the agency originally made a determination that the claimant was disabled and the time the agency determined whether disability ceased." Id. at 775.

We are in accord with the Court of Appeals for the Seventh Circuit in viewing the terms "now" and "current" as susceptible to more than one reasonable explanation when viewed in context. In drafting a section about the cessation of benefits — benefits that were necessarily granted in some prior determination — it makes sense that the statutory drafters would have to distinguish between the unfavorable cessation decision and the earlier, favorable decision to grant benefits. The ambiguity in § 423(f) stems from its reliance on the use of the passive voice. The statute provides, "A recipient of benefits . . . may be determined not to be entitled to such benefits . . . ." The language thus lacks the necessary identifying factor: who is making the determination about entitlement to benefits? It would be logical to presume that it is the ALJ who makes the determination, given the ALJ's role in holding a hearing and reviewing the evidence, but to avoid ambiguity the statute would need to have been drafted more clearly.

Our consideration of a related, more specific provision of § 423 does not resolve this ambiguity. Section 423(d)(5)(B), which applies to both an initial determination of disability and a determination about whether such disability is ongoing, provides, in relevant part:

> In making any determination with respect to whether an individual . . . continues to be under a disability, the Commissioner of Social Security shall consider all evidence available in such individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is

13

not under a disability. In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence . . . necessary in order to properly make such determination . . . .

42 U.S.C. § 423(d)(5)(B). The term "Commissioner" is synonymous with the SSA and thus may be fairly understood to encompass all levels of review within the operation of the agency. It is true that the SSA's decision is not final until after the ALJ hearing and any subsequent appeal occur. Nonetheless, the Commissioner begins review of any cessation case with an initial cessation determination. Because the use of the term "Commissioner" in § 423(d)(5)(B) — a provision which also applies to a cessation proceeding — refers to the agency broadly, rather than specifying the level of review within the agency, it does not unambiguously identify the ALJ as the person making a benefits eligibility determination during a cessation proceeding.

For these reasons, we conclude that § 423(f) is ambiguous.

## C.

Having determined that § 423(f) is ambiguous, we must now decide whether this is the type of case in which Chevron deference is proper, or whether Skidmore instead provides the appropriate framework for reviewing the SSA's interpretation contained in AR 92-2(6). The Supreme Court issued a trilogy of opinions between 2000 and 2002 which guide our analysis.

The first case in the trilogy is Christensen v. Harris County, 529 U.S. 576 (2000), which involved an informal agency adjudication.[11] There, the Court considered whether

---

[11] We recognize that the adjudication at issue in Christensen is different than the Acquiescence Ruling in this matter because, unlike an agency ruling, an adjudication is without

Chevron deference should be given to an opinion letter written by the Acting Administrator of the Department of Labor's Wage and Hour Division. The Supreme Court first explained that "[i]nterpretations such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant Chevron-style deference." Id. at 587.[12] The Court held that we must instead

_____

"general or particular applicability and future effect." 5 U.S.C. § 551; see also 33 Charles Alan Wright & Charles H. Koch, Federal Practice and Procedure § 8342 (1st ed. 2006) (explaining that a decision made through an informal advisory letter or opinion constitutes an adjudication, not a ruling, because these decisions "determine individual rights or duties"). Nonetheless, the similarities regarding the lack of notice-and-comment procedures between these two agency actions render Christensen a useful guidepost.

[12]  Even before the Supreme Court decided Christensen, we recognized that Chevron deference was not appropriate for all forms of agency interpretations. In Cleary, 167 F.3d 801, we considered policy memoranda and letters issued by the Health Care Financing Administration and the Department of Health and Human Services. We noted that determining the proper level of deference "becomes more complicated when the agency's interpretation is contained in informal views or guidelines outside the course of notice and comment procedures." Id. at 807. In such circumstances, "[w]e have questioned what degree of deference, if any, to afford an agency's views." Id. We then explained that Chevron had not overruled the Supreme Court's longstanding rule of deference for informal agency interpretations as contained in Skidmore, 323 U.S. at 140. After applying Skidmore deference, we found the agency's "policy conforms to the language of the statute, to its legislative history, and to the purpose for which it was enacted" and was therefore entitled to deference. Cleary, 167 F.3d at 811–12.

While Cleary remains good law, subsequent developments in the law have complicated our deference analysis. In Cleary, we noted that informal agency interpretations "will receive some deference by the court if

15

give the agency's interpretation "respect" pursuant to the Supreme Court's decision in Skidmore. Id. (quoting Skidmore, 323 U.S. at 140).[13] The Christensen majority held that, upon weighing the Skidmore factors, the Department of Labor's opinion letter was insufficiently persuasive and was therefore unworthy of deference.

In United States v. Mead Corp., 533 U.S. 218 (2001), the Court considered a tariff classification ruling by the United States Customs Service. Id. at 224–25. The Court explained that Chevron was premised on the idea that Congress had explicitly or implicitly delegated authority to an agency to administer a statute, thereby empowering the agency to interpret the statute so long as its interpretation is consistent with the statutory language. Id. at 226–27 (noting Chevron deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"). An express delegation occurred when Congress "'explicitly left a gap for an agency to fill,'" rendering "any ensuing regulation . . . binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." Id. at 227 (quoting Chevron, 467 U.S. at 843–44). Deciding whether Congress implicitly delegated authority to the agency requires a court to consider "the agency's generally conferred authority and other statutory circumstances that [indicate] Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." Id. at 229. The Court noted that "a very

_____

they are consistent with the plain language and purposes of the statute and if they are consistent with prior administrative views." Id. at 808. However, as we will explain, we must now consider the additional (albeit similar) factors set forth in Barnhart v. Walton, 535 U.S. 212, 222 (2002).

[13] We applied this rule in Madison v. Resources for Human Development, Inc., 233 F.3d 175, 186 (3d Cir. 2000), explaining that "[a]s to the persuasiveness of agency interpretive guidelines, we note our continued reliance on the framework laid out in Skidmore v. Swift."

16

good indicator of delegation" would be "congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." Id. This is so because in general, when Congress provides "for a relatively formal administrative procedure . . . [that fosters] fairness and deliberation," it makes sense to assume that "Congress contemplates administrative action with the effect of law." Id. at 230. Nonetheless, the level of formality did not fully resolve the question because precedent showed that Chevron deference might also be appropriate "even when no such administrative formality was required and none was afforded." Id. at 231. Upon consideration of the lack of process and "any other circumstances reasonably suggesting that Congress ever thought of classification rulings as deserving [Chevron] deference," the Court declined to give the tariff classification ruling Chevron deference. Id. The Court remanded for a determination of whether Skidmore deference was appropriate instead.

A year after Mead, the Supreme Court addressed deference to a decision made by the SSA in Barnhart v. Walton, 535 U.S. 212 (2002). There, the Court considered a SSA regulation eventually adopted after notice-and-comment procedures, which related to a policy that the agency had initially adopted through less formal means — including a Social Security Ruling issued some 20 years prior. Id. at 219. The Court disagreed with the recipient's contention that this earlier ruling should not be worthy of deference and explained:

> [T]he fact that the Agency previously reached its interpretation through means less formal than "notice and comment" rulemaking, does not automatically deprive that interpretation of the judicial deference otherwise its due. . . . Mead pointed to instances in which the Court has applied Chevron deference to agency interpretations that did not emerge out of notice-and-comment rulemaking. It indicated that whether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at

17

issue.

Id. at 221–22.

The Court did not employ the "force of law" distinction enunciated in Mead, instead focusing its inquiry on Congress's grant of authority, explicit or implied, as determined by analyzing whether the specific statutory scheme suggests that Congress has granted an agency the power to interpret its own statutory terms. The Court further explained:

> [T]he interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue.

Id. at 222. Reiterating this point, the Court concluded, "The statute's complexity, the vast number of claims that it engenders, and the consequent need for agency expertise and administrative experience lead us to read the statute as delegating to the Agency considerable authority to fill in, through interpretation, matters of detail related to its administration." Id. at 225.

A few guiding principles can be gleaned from the above cases in determining whether to apply Chevron deference or lower Skidmore deference.[14] Our overarching

---

[14] We have infrequently applied the rules set forth in Christensen, Mead, and Barnhart. Perhaps the closest analogous case to the type of agency action we address here is Mercy Catholic Medical Center v. Thompson, 380 F.3d 142, 152 (3d Cir. 2004). There, we declined to apply Chevron deference to an informal interpretive rule issued by the Secretary of the Department of Health and Human Services "as an official instruction to fiscal intermediaries" that was

18

concern is whether "Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226–27. In addition, we will consider the factors set forth in Barnhart: (1) the interstitial nature of the legal question; (2) the related expertise of the agency; (3) the importance of the question to administration of the statute; (4) the complexity of that administration; and (5) the careful consideration the agency has given the question over a long period of time. 534 U.S. at 222.[15]

---

later published in the Federal Register. Id. We noted that "agency interpretive guidelines 'do not rise to the level of a regulation and do not have the effect of law.'" Id. at 155 (quoting Brooks v. Vill. of Ridgefield Park, 185 F.3d 130, 135 (3d Cir. 1999)). We also explained that Chevron deference is inappropriate for "informal agency interpretations" because allowing strong deference "'would unduly validate the results of an informal process.'" Id. (quoting Madison, 233 F.3d at 185). After applying Skidmore, we held that the agency's interpretation was not persuasive and declined to afford it any deference. Id. at 155–58.

[15] Many of these questions can be resolved by examining the language and structure of the statute that an agency is charged with administering. Regarding the complexity of the regulatory program at issue, it should be noted that courts more readily grant Chevron deference when a case involves a "complex and highly technical regulatory program," which "require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quotation marks omitted). The length of time an agency has considered the question also relates to whether the agency has been consistent in its interpretation over the years. In general, more deference is afforded to longstanding agency interpretations, although this single factor is not itself outcome-determinative. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 487 (2004) ("We normally accord particular deference to an agency interpretation of longstanding duration . . . ."); Cleary, 167

19

1.

A somewhat detailed description of the nature of an Acquiescence Ruling is necessary to aid our deference analysis. Broadly, agencies are empowered to interpret a statute through the processes of rulemaking, adjudication, or licensing. Administrative Procedure Act ("APA"), 5 U.S.C. § 551, et seq. Rulemaking is defined as the "agency process for formulating, amending, or repealing a rule," and a rule is defined as an "agency statement of general or particular applicability and future effect." Id. § 551(4), (5). The rulemaking process must involve the notice-and-comment procedures outlined in the APA unless there is good cause or the proposed rule falls into the category of "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." Id. § 553(b)(3)(A). In the context of the administration of the Social Security Act, the SSA issues two types of rulings which do not involve notice-and-comment procedures: Social Security Rulings, which address both administrative and judicial decisions, and Acquiescence Rulings,[16] which relate only to decisions by federal appellate courts. Social Security and Acquiescence

F.3d at 808 (providing that informal agency interpretations "will receive some deference by the court if they are . . . consistent with prior administrative views"). But see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005) (affording Chevron deference to an interpretation by the Federal Communications Commission despite the recent change in policy at the agency because "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the Chevron framework"); Chevron, 467 U.S. at 863–64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis.").

[16] Although it is clear that the process for formulating an Acquiescence Ruling does not require notice-and-comment, the procedure employed by the SSA is somewhat opaque because the agency's internal guidelines do not explain the process for drafting and approving an Acquiescence Ruling or who bears the responsibility for doing so.

Rulings, available at http://www.ssa.gov/OP_Home/rulings/ rulings-pref.html (last visited August 8, 2012).

Acquiescence Rulings "explain how SSA will apply a holding by a United States Court of Appeals that is at variance with [the agency's] national policies for adjudicating claims." Acquiescence Ruling Definition, available at http://www.ssa.gov/regulations/def-ar.htm (last visited August 8, 2012); see also 20 C.F.R. § 404.985(b) (stating that the SSA will issue an Acquiescence Ruling when it "determine[s] that a United States Court of Appeals holding conflicts with [the SSA's] interpretation of a provision of the Social Security Act or regulations"); Social Security Acquiescence Ruling 05–1(9), 70 Fed. Reg. 55,656 (Sept. 22, 2005) ("An acquiescence ruling explains how [the SSA] will apply a holding in a decision of a United States Court of Appeals that [the SSA] determine[s] conflicts with [its] interpretation of a provision of the Social Security Act (Act) or regulations when the Government has decided not to seek further review of that decision or is unsuccessful on further review."). The content of this type of ruling "describe[s] the administrative case and the court decision, identif[ies] the issue(s) involved, and explain[s] how [the SSA] will apply the holding, including, as necessary, how the holding relates to other decisions within the applicable circuit." 20 C.F.R. § 404.985(b). Acquiescence Rulings are announced through publication "in the 'Notices' section of the Federal Register under the authority of the Commissioner of Social Security and are effective upon publication." Acquiescence Ruling Definition, supra. Importantly, "ARs do not have the force and effect of the law or regulations," although the SSA requires that they be "binding on all components of SSA unless superceded, rescinded, or modified by another ruling." Id.[17]

---

[17] It might appear from this brief description that the name "Acquiescence Ruling" is something of a misnomer given that these rulings are issued to indicate the SSA's policy of refusing to follow the decision of a Court of Appeals. However, such rulings specifically explain the SSA's general policy that it will comply with the appellate ruling within the circuit where the ruling was issued except to the extent that it elects to relitigate the issue. See 20 C.F.R. § 404.985(a)

21

2.

We now turn to AR 92-2(6) which, as noted, contains the SSA's interpretation of § 423(f). Without elucidating the SSA's reasoning, the Acquiescence Ruling provides that "the term 'current,' as used in the statutory and regulatory language concerning termination of disability benefits, [] relate[s] to the time of the cessation under consideration in the initial determination of cessation." AR 92-2(6). During the course of a cessation proceeding, the ruling explains, the relevant factor is "the claimant's condition . . . at the time of the cessation determination, not the claimant's condition at the time of the disability hearing / reconsideration determination, ALJ decision or Appeals Council decision." Id. The ruling also discloses the SSA's policy that any condition that became disabling during the pendency of a proceeding would result in the solicitation of a new application for benefits. AR 92-2(6) concludes by explaining that, in light of its disagreement with Difford, it would comply with that decision in the Sixth Circuit only.

Several factors counsel against according Chevron deference to AR 92-2(6). For instance, Acquiescence Rulings do not undergo notice-and-comment before their passage. We also note that Acquiescence Rulings lack the force of law, a view supported by the SSA's language in its internal policies, see Social Security and Acquiescence Rulings, supra ("Acquiescence Rulings do not have the force and effect of the law or regulations."), and our prior jurisprudence.[18] See

_____

("We will apply a holding in a United States Court of Appeals decision that we determine conflicts with our interpretation of a provision of the Social Security Act or regulations . . . . within the applicable circuit . . . ."). Such compliance is generally proper to avoid exceeding the scope of the agency's power, because it is axiomatic that it is within the province of the judiciary "to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803).

[18] It is worth explaining what we mean when we refer to "the force of law." The Supreme Court has explained that a rule has "the 'force and effect of law'" when it possesses "certain substantive characteristics"

22

Mercy, 380 F.3d at 155 (noting that "agency interpretive guidelines do not rise to the level of a regulation and do not have the effect of law" (quotation marks omitted)).  Further, it is unclear how much care the SSA exerted in crafting AR 92-2(6).  The ruling spans a total of three-and-a-half pages, two of which are dedicated to describing the circumstances of the case that prompted its issuance.  The SSA devotes only one paragraph to its interpretation of the statute and does not explain how or why it reached its interpretation, a factor which weighs against deference.  See Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 252–53 (3d Cir. 2005) (holding a single-paragraph "informal and cursory" letter by the Department of Transportation interpreting the Motor Carrier Act was not entitled to Chevron deference).

There are, however, several institutional concerns which counsel towards Chevron deference.  The Social Security Act imbues the SSA with "exceptionally broad authority to prescribe standards" for effectuating the purpose of the statute.  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981); see 42 U.S.C. § 405(a) (directing the SSA to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same" for disability cases).  In other words, the Social Security Act does not explicitly cover a vast number of details related to the day-to-day administration of the Social Security program, and Congress has relied on the SSA to fill this abyss.  Moreover, the Supreme Court has observed that "the Social Security hearing system is probably the largest adjudicative agency in

and is "the product of certain procedural requisites." Chrysler Corp. v. Brown, 441 U.S. 281, 301 (1979). An "important touchstone" for distinguishing whether a rule has the force of law is whether the rule "affect[s] individual rights and obligations."  Id. at 302 (quotation marks omitted).  While Acquiescence Rulings are "binding" within the SSA, this binding effect does not extend beyond the agency to bear on the "individual rights and obligations" of the people and entities regulated by the SSA.  Thus, as the SSA recognizes, Acquiescence Rulings lack the force of law.

23

the western world." <u>Barnhart v. Thomas</u>, 540 U.S. 20, 28–29 (2003) (quotation marks omitted). Given the vast scope and complexity of the program, "[t]he need for efficiency is self-evident." <u>Id.</u> at 29. We are thus faced with a situation where the agency has a great deal of expertise in administering a complex program and has been entrusted with a great deal of power by Congress. <u>See</u> <u>Nat'l Cable & Telecomms.</u>, 545 U.S. at 980–81 (deferring to a Federal Communications Commission regulation under <u>Chevron</u> because Congress gave "the Commission the authority to promulgate binding legal rules; the Commission issued the order under review in the exercise of that authority; and no one questions that the order is within the Commission's jurisdiction"); <u>cf.</u> <u>Gonzales</u>, 546 U.S. at 268–69 (declining to give <u>Chevron</u> deference to the Attorney General's interpretation of the Controlled Substances Act because the Attorney General lacked the expertise and authority to make such an interpretation). The issue here — the timing for review of a disability benefits recipient who may no longer be disabled — is of great importance to the administration of the program, and variance in the internal rules for such a determination could create an administrative nightmare at all levels of review. This is especially true in light of the length of time that appears to pass between the initial cessation date and the hearing before an ALJ, which in this case spanned four years. It is also worth noting that the interpretation here is not a recent invention; it has been in effect for twenty years and appears to have been consistently applied by the SSA outside of the Sixth Circuit. We have no doubt that despite the brevity of AR 92-2(6), it represents the considered judgment of the SSA in determining how to manage a highly detailed and complex statutory scheme.

After consideration of the above factors, we are persuaded that <u>Skidmore</u> deference provides the proper lens through which to view AR 92-2(6).[19] Congress has imbued the SSA with the authority to enact regulations with legal effect, but the SSA elected not to do so and instead

---

[19] We need not decide whether, under the fact-intensive test we have described, any Acquiescence Ruling could merit <u>Chevron</u> deference.

formulated its policy through the informal mechanism of an Acquiescence Ruling, a type of ruling that is non-binding except within the agency. It is not entirely clear from the Supreme Court's precedent whether the lack of the "force of law" is always fatal to the application of Chevron, but in any event, the lack of legal effect of this ruling, combined with the absence of formal notice-and-comment rulemaking and the failure of the SSA to describe its reasoning, cannot be counterbalanced by the SSA's institutional desire for uniformity and ease of administration. [20]

\* \* \* \* \*

We therefore hold that Skidmore, not Chevron, provides the type of deference applicable to our review of AR 92-2(6).

### D.

Having determined that we will employ Skidmore deference in reviewing AR 92-2(6), the central question we are tasked with answering is whether the SSA's interpretation is persuasive. We do not believe this question can be answered by conducting an independent review of the statute and then comparing our analysis with that of the agency, for such a process would not endow the agency's interpretation with the "respect" that it may be entitled to under Skidmore. Instead, to decide whether we should defer to an agency's interpretation after we have determined that Skidmore provides the appropriate lens through which to view that interpretation, we begin by considering how much deference the agency's opinion is entitled to.

---

[20] We note our decision to apply Skidmore deference to AR 92-2(6) is contrary to the only other court of appeals decision addressing what type of deference should be given to this ruling. See Johnson, 191 F.3d 770 (applying Chevron deference to AR 92-2(6) without discussion). Because the Court of Appeals for the Seventh Circuit's opinion in Johnson predates the Supreme Court's decisions in Christensen, Mead, and Barnhart, we do not view its application of Chevron as persuasive.

25

As noted, Skidmore deference requires a court to assign a "weight" to an administrative judgment based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. Such weight is appropriate, the Skidmore Court held, because "rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Id. We, like many of our sister courts of appeals, have adopted Mead's conceptualization of the Skidmore framework as a "sliding-scale" test in which the level of weight afforded to an interpretation varies depending on our analysis of the enumerated factors. Mead, 533 U.S. at 228 ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances[,] . . . produc[ing] a spectrum of judicial responses, from great respect at one end, to near indifference at the other." (citations omitted)); see Ebbert v. DaimlerChrysler Corp., 319 F.3d 103, 115 (3d Cir. 2003) (referring to certain categories of documents as being "at the lower end of the Skidmore scale of deference"); see also Kristin E. Hickman & Matthew D. Krueger, In Search of the Modern Skidmore Standard, 107 Colum. L. Rev. 1235, 1271 (2007) (determining, after a five-year review of all courts of appeals cases applying Skidmore, that "the sliding-scale model of Skidmore deference dominates the independent judgment model among the federal circuit courts of appeals").

Through our previous applications of Skidmore to informal agency interpretations, some important factors have emerged. For example, we have noted that more deference is granted under Skidmore's sliding scale test when the agency's interpretation is "issued contemporaneous[ly] with a statute." Madison, 233 F.3d at 187. Less deference is afforded when an agency's interpretation is inconsistent with its prior positions. See Mercy, 380 F.3d at 155 (holding the Skidmore factors counseled against affording the agency's interpretation deference given the agency's "internally conflicting positions" and the unreasonableness of its

26

interpretation).  We have held that, when determining what deference to give to an agency's actions under Skidmore, "[t]he most important considerations are whether the agency's interpretation 'is consistent and contemporaneous with other pronouncements of the agency and whether it is reasonable given the language and purpose of the Act.'"  DDNR, 685 F.3d at 284 (quoting Cleary, 167 F.3d at 808).

Additionally, many of the same circumstances we found relevant for determining whether to apply Chevron deference are also useful for deciding the level of deference due under Skidmore.  For example, the relative expertise of the SSA in administering a complex statutory scheme and the agency's longstanding, unchanging policy regarding this issue counsel towards a higher level of deference.  See Alaska Dep't of Envtl. Conservation, 540 U.S. at 492 (holding that the Environmental Protection Agency's ("EPA") interpretation of the Clean Air Act ("CAA") in internal guidance memoranda merited sufficient "respect" under Skidmore for the Court to defer to the agency's "longstanding, consistently maintained interpretation" because the EPA was the "expert federal agency charged with enforcing the [CAA]").  On the other hand, the brevity of AR 92-2(6) and its underdeveloped reasoning counsel toward a lower level of deference.  See Packard, 418 F.3d at 252–53 (holding that a brief letter by the Department of Transportation interpreting the Motor Carrier Act was entitled to no deference under Skidmore because the letter "simply provide[d] no reasoning or analysis that a court could properly find persuasive").

Applying these factors to the instant matter reveals that a relatively high level of deference is warranted.  As we have explained above, the SSA is an agency to which Congress has given "exceptionally broad authority" to manage a complex, nationwide administrative system.  Schweiker, 453 U.S. at 43.  The need for uniformity in such an organization cannot be doubted.  Moreover, administering the Social Security Act is the central purpose of the SSA, and the SSA has developed a massive body of expertise during the 56 years of the disability insurance program's existence.  Although the text of the Acquiescence Ruling does not explain the reasoning behind the SSA's adoption of its interpretation, the SSA appears to

have consistently applied this policy during the past 20 years and its reasons for creating a policy which sets a fixed date for review of a cessation determination are not difficult to discern. In sum, these considerations counsel toward applying a fairly high level of deference on the Skidmore scale.

After applying an appropriately high level of deference under Skidmore, we find the SSA's interpretation of § 423(f) sufficiently persuasive to defer to it. While it may not be the interpretation we would adopt if we were to engage in an independent review, the interpretation contained in AR 92-2(6) represents the considered judgment of the agency and is in accordance with the SSA's statutory mandate to set rules for the governance of the disability insurance program. Essentially, the SSA conceptualizes the cessation scheme as one in which there is a single determination followed by several layers of review. Under this view, the terms "now" and "current" in § 423(f) refer to the date of the initial finding that a recipient's disability has ceased. Therefore, the ALJ's role in a cessation proceeding is to review the SSA's determination that a benefits recipient was not eligible for benefits as of a fixed, specific date, not to determine whether he might have become eligible at some later time. The SSA's interpretation finds support in the fact that the Social Security Act requires that a "period of disability" be "continuous" and requires the filing of an application for benefits in order to begin such a period. 42 U.S.C. § 416(i)(2). The Social Security program is thus designed to prevent any breaks in the continuity of a period of disability and the attendant benefits that flow from such a disability. As the Court of Appeals for the Seventh Circuit recognized, allowing an ALJ to consider a benefits recipient's status several years after the initial determination that the recipient was no longer disabled would potentially allow a break in continuity in contravention of the statute. See Johnson, 191 F.3d at 747 (deferring to the SSA's interpretation in AR 92-2(6) because of the potential lack of continuity in the disability period and the fact that allowing a revised evaluation of the recipient at the time of the ALJ hearing would require the ALJ "to adjudicate disability for a new period of time — from the cessation of disability benefits . . . until the date of the ALJ's decision"). Moreover, the Social Security Act was designed to ensure

that benefits would accrue only during periods of time in which a person is truly unable to work. If Hagans was capable of working as of September 1, 2004, but became classifiable as disabled on some later date, allowing him to receive disability benefits for that interim period when he was not disabled would thwart the purpose of the SSA.

In response to these arguments, Hagans contends that our opinion in Reefer v. Barnhart, 326 F.3d 376 (3d Cir. 2003), requires that we consider an individual's status at the time of the ALJ hearing. That case, however, requires only that an ALJ consider evidence produced after the cessation date, not the status of the disability benefits recipient as of some length of time — usually years — after the SSA determined that person was no longer disabled. Id. at 381. Indeed, the Social Security Act unambiguously compels consideration of later-acquired evidence by the ALJ. See 42 U.S.C. § 423(f) ("Any determination under this section shall be made on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner of Social Security."). While the fact that all evidence available must be considered may support Hagans's construction of § 423(f), it is not dispositive because evidence acquired after the cessation date can nonetheless be relevant for the purposes of determining the individual's capabilities on the cessation date.[21]

If the evidence is sufficient to show that Hagans was not disabled as of September 1, 2004, he would not be entitled to benefits as of that date. Otherwise, a fully recovered disability benefits recipient who later relapsed could receive benefits for several years during which he was not actually disabled and was capable of work. Moreover, the ALJ's role in a Social Security cessation proceeding is to review the SSA's determination that a benefits recipient was

---

[21] We also note that the ALJ in this case did consider all relevant evidence introduced at the time of the hearing, as required, including medical reports dating from 2005 and 2006.

29

not eligible for benefits as of a certain date, not to determine whether he might have become eligible at some later time. Indeed, after the ALJ denied Hagans's appeal, he filed a new application for disability benefits covering a more recent time period on the grounds that his impairments have worsened since the SSA determined that his disability ended.

Given our deference to the SSA's persuasive interpretation of § 423(f) under Skidmore, we will affirm the District Court's finding that the SSA correctly evaluated Hagans's condition as of the date on which the agency first found that Hagans's eligibility for disability benefits ceased.

IV.

Hagans cursorily argues that the ALJ's adverse findings are not supported by substantial evidence. Because this argument is plainly meritless, we need address it only briefly.

When the SSA finds that a disability benefits recipient no longer has the physical or mental impairment to render him disabled, the SSA may determine that the recipient is no longer entitled to disability benefits. 42 U.S.C. § 423(f). Substantial evidence must demonstrate that the recipient's condition has experienced "medical improvement" such that the recipient is "able to engage in substantial gainful activity." Id. A key part of this analysis involves comparing the severity of the impairment at the time of the most favorable recent disability determination with the current severity of that impairment. 20 C.F.R. § 404.1594(b)(7), (c)(1). The Social Security regulations require that benefit recipients be subject to the following set of eight evaluation questions when the SSA is attempting to determine whether they remain disabled:

> (1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

> (2) If you are not, do you have an impairment or

30

combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of

the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 404.1560. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

Id. § 404.1594(f). Within the context of a termination proceeding, there is a burden-shifting scheme in which a recipient must first "introduce[] evidence that his or her condition remains essentially the same as it was at the time of the earlier determination." Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984). Once a recipient has done so, "the burden shifts to the [SSA] to 'present evidence that there has been sufficient

improvement in the [recipient's] condition to allow the [recipient] to undertake gainful activity.'" Id. (quoting Kuzmin v. Schweiker, 714 F.2d 1233, 1237 (3d Cir. 1983)).

Hagans points to no evidence that contradicts the ALJ's determination that his medical impairments underwent an improvement between January 2003 and September 2004, and thus fails to shift the burden to the SSA. The medical reports and the RFC indicated that, although Hagans was no longer capable of doing his past relevant work, his increased mobility and the decrease in the severity of his conditions rendered him fit to engage in sedentary work. Moreover, although Hagans seems to argue that the ALJ did not properly consider his mental illness (depression) in conjunction with his other problems, the ALJ did consider Hagans's mental problems and determined they did not meet the criteria to constitute a listed impairment. She also considered his depression in determining the type of work Hagans could perform.

As the record amply supports the ALJ's finding that Hagans ceased to be disabled on September 1, 2004, we will affirm the District Court's finding that this determination was supported by substantial evidence.

V.

For the foregoing reasons, we will affirm the judgment of the District Court.

33